Christopher L. Lebsock (#184546)
**HAUSFELD LLP**
580 California Street
12th Floor
San Francisco, CA 94101
Telephone: (415) 633-1908
Facsimile: (415) 358-4980

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARTH'S HEALING, INC., | Case No. 25-cv-1428 |
| Plaintiff, | **CLASS ACTION** |
| v. | **DEMAND FOR JURY TRIAL** |
| SHENZHEN SMOORE TECHNOLOGY CO. LTD.; JUPITER RESEARCH LLC; GREENLANE HOLDINGS, LLC; 3WIN CORP.; and CB SOLUTIONS, LLC d/b/a CANNA BRAND SOLUTIONS, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................1

II.  JURISDICTION AND VENUE ...........................................................3

III.  PARTIES...........................................................................................4

   A.  PLAINTIFF ..................................................................................4
   B.  DEFENDANTS .............................................................................4

IV.  AGENTS AND CO-CONSPIRATORS.................................................5

V.  CLASS ACTION ALLEGATIONS .......................................................6

VI.  FACTUAL ALLEGATIONS ...............................................................9

   A.  THE UNITED STATES VAPE MARKET ........................................9
      1.  *The Emergence of a New Market* ...................................9
      2.  *The Vape Supply Chain in the United States* .............11
      3.  *Vapes Available in the United States Today* ...............12
   B.  DEFENDANTS' UNLAWFUL HORIZONTAL CONSPIRACY ..................14
   C.  THE DEFENDANTS' OTHER EXCLUSIONARY CONDUCT....................16
   D.  THE STRUCTURE AND CHARACTERISTICS OF THE WHOLESALE DISTRIBUTION OF VAPES IN THE UNITED STATES ....................................21
      1.  *The Market for Vapes in the United States is Highly Concentrated, with Defendant Smoore Being the Dominant Manufacturer and the Authorized Distributors Being the Dominant Distributors*................21
      2.  *Barriers to Entry are High* ........................................22
      3.  *Demand for Vapes is Inelastic* ..................................23
      4.  *There Were Numerous Opportunities for the Defendants to Collude* ......23
   E.  INTERSTATE TRADE AND COMMERCE ..........................................24

VII.  TOLLING OF THE STATUTES OF LIMITATIONS ..........................24

   A.  PLAINTIFF COULD NOT HAVE DISCOVERED ITS INJURY WITHIN FOUR YEARS OF FILING THIS COMPLAINT ...........................................24
   B.  IN THE ALTERNATIVE, THE DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY ......................................................................24
   C.  IN THE ALTERNATIVE, THE CONTINUING VIOLATION DOCTRINE APPLIES ......26

VIII. CLAIM FOR RELIEF ......................................................................26

COUNT ONE ........................................................................................26

PRAYER FOR RELIEF ...........................................................................27

JURY TRIAL DEMANDED .....................................................................28

Plaintiff, Earth's Healing, Inc. ("Plaintiff"), on behalf of itself and a Class of direct purchasers of closed cannabis oil vaporizer systems and components ("Vapes") manufactured and sold by Defendant Shenzhen Smoore Technology Co. Ltd. ("Smoore") or its authorized distributors—Jupiter Research LLC ("Jupiter"), Greenlane Holdings, LLC ("Greenlane"), 3Win Corp. ("3Win"), and/or CB Solutions, LLC d/b/a Canna Brand Solutions ("Canna Brand," and with Jupiter, Greenlane, and 3Win, the "Authorized Distributors," and with Smoore, the "Defendants")—in the United States and its territories between November 16, 2016 and until the effects of the conspiracy have ceased (the "Class Period"), brings this Class Action Complaint for damages and equitable relief against Defendants for violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

All allegations herein other than those concerning the Plaintiff are based on information and belief.

# I.    INTRODUCTION

1.    This lawsuit arises from the Defendant Smoore and its Authorized Distributors' unlawful agreement not to compete with one another. The Defendants are horizontal competitors at the distribution level (*i.e.*, the level at which Plaintiffs and members of the Class purchased Vapes), and their agreement is therefore a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

2.    Defendant Smoore is a Chinese company. At all relevant times, Smoore has been the dominant manufacturer of Vapes sold in the United States. Indeed, Smoore holds itself out as the "world's leading atomization technology company" and "the world's largest vaping technology manufacturer." Defendant Smoore's flagship Vape is known as CCELL.

3.    Throughout the Class Period, Smoore has sold its Vapes in the United

States both directly and through its Authorized Distributors.[1] That is, at all relevant times, Smoore has been both a supplier to and competitor with the Authorized Distributors in the wholesale distribution of Vapes sold in the United States.

4.    There have been no meaningful competitors to Defendant Smoore and its Authorized Distributors in the United States, and the Defendants have possessed and exercised significant market power in the wholesale distribution of Vapes sold in the United States.

5.    The price for Smoore's Vapes has been subject to a horizontal restraint since it was first introduced to the United States market on November 16, 2016. Specifically, on November 16, 2016 Smoore introduced its first Vape—jointly with its Authorized Distributor, Jupiter—to the United States market at the Marijuana Business Conference & Expo in Las Vegas, Nevada. In order to jointly market and sell Smoore's Vape, Jupiter and the other Defendants entered into an agreement that defined the terms on which they would sell Vapes to customers in the United States, including the prices to be charged.

6.    Specifically, Smoore and each of its Authorized Distributors entered into **written and signed agreements** to (a) not charge their customers below minimum prices agreed to by all of the Defendants and (b) not compete for other Defendants' (including Smoore's) customers (the "Distributor Agreements"). The Distributor Agreements are direct evidence of the Defendants' conspiracy.

7.    Each Defendant knows that every other Defendant also agreed to these contractual restraints of competition. For example, (a) Smoore and its Authorized Distributors provided training to their employees that include an express instruction that they are prohibited from competing for each other's customers, and (b) Smoore

---

[1]    *See* Initial Determination of Violation of Section 337 and Recommended Determination of Remedy and Bond at 97 in *In re Certain Oil-Vaping Cartridges, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1286 (U.S. Int'l Trade Comm'n Feb. 1, 2023) (hereinafter, "ITC Decision").

and its Authorized Distributors held in-person meetings, including one in Los Angeles in 2019, where they confirmed that the Defendants had agreed not to compete with one another.

8. The Defendants monitored and policed their agreement through the Authorized Distributors' monthly sharing of confidential customer names and price information, as well as through the Authorized Distributors' reporting of potential violations directly to Smoore. When the Defendants discovered a potential violation, Smoore contacted the alleged violator and stopped the offending action. In addition, Smoore punishes violators by deducting money from the security deposit the Authorized Distributors are required to pay Smoore.

9. The Defendants' agreement is *per se* illegal under the antitrust laws. First, because Smoore competes with each of its Authorized Distributors in the sale of Vapes at the wholesale distribution level (*i.e.*, sales to Plaintiff and the Class), the Defendants' agreement not to compete is in and of itself a horizontal restraint. *See*, *e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec Co.*, 20 F.4th 466, 481 (9th Cir. 2021). Additionally, because Smoore organized, facilitated, and enforced a horizontal conspiracy between the Authorized Distributors—the dominant wholesale distributors of Vapes in the United States—the agreement is also a horizontal restraint. *See*, *e.g.*, *United States v. Gen. Motors Corp.*, 384 U.S. 127, 145 (1966).

10. The Defendants' anticompetitive conduct has artificially fixed the price of Smoore's Vapes in the United States at supra-competitive levels throughout the Class Period, and as a result, Plaintiff and members of the putative Class paid higher prices for Smoore's Vapes.

## II.   JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367, and personal jurisdiction pursuant to 15 U.S.C. § 22 and the doctrine of pendent personal jurisdiction, as well as the California long-

arm statute (Cal. Code of Civ. Procedure § 410.10).

12.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c), because a substantial portion of the affected interstate trade and commerce was carried out in this District and/or one or more of the Defendants does business in this District.

13.    Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District.

14.    The anticompetitive conduct alleged herein has been directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

15.    Further, because this case arises under the Sherman Act, this Court has personal jurisdiction over each of the Defendants based on their contacts with the United States as a whole. *See Shields v. Federation Internationale de Natation*, 419 F. Supp. 3d 1188, 1202 (2019) ("There is no dispute that the relevant forum for the Court's jurisdictional analysis in these antitrust actions is the United States as a whole, and not merely California").

## III.    PARTIES

### A.    Plaintiff

16.    Plaintiff Earth's Healing, Inc. is a resident of the State of Arizona. During the Class Period, Plaintiff directly purchased Vapes manufactured by Smoore directly from one or more of the Defendants.

### B.    Defendants

17.    Defendant Smoore is a corporation organized under the laws of China having its principal place of business at Block 16, Dongcai Industry Park, Gushu Village, Bao'an District, Shenzhen, China. During the Class Period, Smoore sold its

Vapes in the United States to its Authorized Distributors and directly to members of the putative Class.

18.    Defendant Jupiter is an Arizona Limited Liability Company with its principal place of business located at 8825 N 23rd Avenue, Suite 100, Phoenix, Arizona 85021. During the Class Period, Jupiter sold Smoore Vapes in the United States directly to members of the putative Class. Jupiter has been an authorized distributor for Smoore since at least 2016.

19.    Defendant Greenlane is a Delaware Limited Liability Company with its principal place of business at 1095 Broken Sound Parkway NW, Boca Raton, Florida 33487. In August 2021, Greenlane completed a merger with KushCo, Inc., which was formerly a Nevada corporation having its principal place of business at 6261 Katella Ave., Suite 250, Cypress, California 90630. During the Class Period, Greenlane and KushCo sold Smoore Vapes in the United States directly to members of the putative Class. Greenlane, through its predecessor KushCo, has been an authorized distributor for Smoore since at least 2017.

20.    Defendant 3Win is a Nevada corporation with its principal place of business as 7850 S. Handy Dr., Suite B122, Tempe, Arizona 85284. During the Class Period, 3Win sold Smoore Vapes in the United States directly to members of the putative Class. 3Win has been an authorized distributor for Smoore since at least 2016.

21.    Defendant Canna Brand is a Washington Limited Liability Company with its principal place of business located at 802 134th Street SW Suite 130, Everertt, Washington 98204. During the Class Period, Canna Brand sold Smoore Vapes in the United States directly to members of the putative Class. Canna Brand has been an authorized distributor for Smoore since at least 2017.

## IV.    AGENTS AND CO-CONSPIRATORS

22.    The acts alleged against the Defendants in this Complaint were

authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of each Defendants' businesses or affairs.

23.    Various persons and/or firms not identified as Defendants herein may have also participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to amend this Complaint to add these co-conspirators, if any, to this action at an appropriate time in the future.

24.    Each Defendant acted as the principal, agent, or joint venture of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

25.    Defendant Smoore and its Authorized Distributors are participants and as aiders and abettors in the improper acts, plans, schemes and transactions that are the subject of this Complaint. The Defendants have participated as members of the anticompetitive scheme or acted with or in furtherance of it, or aided or assisted in carrying out its purposes alleged in this Complaint, and have performed acts and made statements in furtherance of the restraints of competition set forth herein.

## V.    CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action for damages and equitable relief on behalf of itself and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), with the Class initially defined to include the following:

> All persons or entities in the United States and its territories who purchased Vapes manufactured by Smoore or an Authorized Distributor directly from one or more of the Defendants, or their subsidiaries or affiliates, during the period at least as early as November 16, 2016, until the effects of the conspiracy ceased (the "Class Period").

27.    Excluded from the Class are the following persons or entities: (a) all

persons and entities not authorized or licensed to conduct a cannabis-related business under any State's law; (b) the Defendants identified herein; (c) any of the Defendant's parent companies, subsidiaries, and affiliates; (d) any of the Defendant's officers, directors, management, employees, subsidiaries, affiliates or agents; (e) the judges and chambers staff assigned to this case, as well as the members of their immediate families; and (f) all jurors assigned to this case. Plaintiff reserves the right to expand, change, or modify the class definition based upon discovery and further investigation.

28.    ***Numerosity.*** Plaintiff does not know the exact number of Class members. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, the Class is so numerous and geographically dispersed that joinder of all Class members in the prosecution of this action is impracticable.

29.    ***Typicality.*** Plaintiff's claims are typical of the claims of its fellow Class members because Plaintiff purchased Vapes manufactured by Smoore during the Class Period. Plaintiff and all Class members were damaged in the same manner by the same wrongful conduct of the Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

30.    ***Commonality.*** The Defendants have acted on grounds generally applicable to the Class, thereby making final damages and equitable relief appropriate with respect to the Class as a whole. Moreover, numerous questions of law or fact common to the entire Class—including, but not limited to, those identified below—arise from the Defendants' anticompetitive and unlawful conduct:

(a)    Whether the Defendants entered into a horizontal agreement in restraint of trade;

(b)    Whether Smoore organized, facilitated, and enforced an agreement among and between itself and the Authorized Distributors;

(c)    Whether the Defendants' conduct caused the price of Vapes

manufactured by Smoore and/or the Authorized Distributors and sold in the United States to be higher than the competitive level as a result of their restraint of trade;

(d)    The duration of the Defendants' anticompetitive conduct;

(e)    The identity of the participants of the alleged anticompetitive conduct;

(f)    Whether the alleged anticompetitive conduct violated the Sherman Act;

(g)    Whether Plaintiff and members of the Class had any reason to know or suspect the conspiracy, or any means to discover the anticompetitive conduct;

(h)    Whether the Defendants fraudulently concealed the existence of the anticompetitive conduct from Plaintiff and members of the Class;

(i)    Whether Plaintiff and the other members of the Class were injured by the Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages; and

(j)    Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

31.    ***Predominance.*** These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

32.    ***Adequacy.*** Plaintiff will fairly and adequately represent the interests of the Class because it purchased Vapes manufactured by Smoore during the Class Period and have no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

33.    ***Superiority.*** This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. Moreover, the prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## VI.    FACTUAL ALLEGATIONS

### A.    The United States Vape Market

#### 1.    *The Emergence of a New Market*

34.    Beginning in 2012, States began to legalize cannabis for recreational use.[2] In 2012, Colorado and Washington legalized the recreational use of cannabis at the state level; Alaska, Oregon, and Washington, D.C. legalized recreational cannabis use in 2014; and California, Nevada, Massachusetts, and Maine did so in 2016. As of today, recreational cannabis is legal in twenty-four (24) States. In addition, medical cannabis is legal in another fifteen (15) States.

---

[2]    Cannabis (marijuana) refers to "the dried leaves, flowers, stems, and seeds from the Cannabis sativa L plant. The plant contains the . . . chemical THC and other similar compounds. Extracts can also be made from the cannabis plant." *See* https://nida.nih.gov/publications/drugfacts/cannabis-marijuana.

35.    The below image (**Figure 1**) shows where cannabis is legal in the United States:



*Figure 1: Marijuana Legalization in the United States*

36.    The wave of cannabis legalization led to interest in new forms of cannabis consumption. Previously, cannabis consumption methods were limited by the lack of professionalized cannabis producers investing research and development efforts into improving existing cannabis consumption methods, but after legalization, cannabis producers looked for innovative ways to improve the use of cannabis for consumers.

37.    One such emerging commercial opportunity was vaporized cannabis products. As opposed to smoked cannabis, which relies on combustion to produce smoke, vaporized cannabis aerosolizes the cannabis.

38.    Defendant Smoore was an early entrant into the United States market, repackaging nicotine vaporizers as cannabis vaporizers, and selling them into the United States directly and through one or more of the Authorized Distributors

beginning on or around November 16, 2016. As a result of Smoore's early entry, Smoore quickly became the dominant manufacturer of Vapes sold in the United States.

39.    However, early Vapes were created for nicotine rather than cannabis oils, and they had the potential to produce unpleasant tastes, leaks, and clog, when used with cannabis oils. This is because nicotine oils are stable, homogenous, and not viscous, whereas cannabis oils are unstable, heterogenous, and viscous.

### 2.    *The Vape Supply Chain in the United States*

40.    While each State's cannabis market is localized to within its borders, the market for Vapes is nationwide, as Vapes ***not*** containing cannabis—such as the Vapes sold by Defendants to Plaintiff and the Class—can be (and are) shipped nationwide.

41.    Generally speaking, the supply chain for Vapes in the United States has three levels between manufacturers and consumers.

> (a)    <u>Manufacturing</u>: Vape manufacturers, either located overseas or in the United States, manufacture the Vapes.
>
> (b)    <u>Wholesale Distribution</u>: Vape manufacturers sell their Vapes into the United States in bulk, either directly or through authorized distributors, to Plaintiff and members of the Class.
>
> (c)    <u>Retail Distribution</u>: Plaintiff and members of the Class then fill the empty Vapes with oils or extracts and sell them to licensed retail shops (or if vertically integrated, directly to consumers).
>
> (d)    <u>Consumer Sales</u>: Consumers purchase the filled Vapes.

42.    The dominant Vape manufacturer in the United States is Smoore, and the dominant Vape distributors in the United States are the Authorized Distributors.

43.    Smoore competes with its Authorized Distributors at the wholesale distribution level through its CCELL direct sales team. For example, Jupiter's parent

company, Tilt Holdings Inc., acknowledged in a recent Form 10-K filing that its "business competes primarily with distributors of CCELL® vape hardware, and with CCELL's direct sales team, in the U.S. and Canada." Similarly, the International Trade Commissions recently found that "[i]n many instances, a distribution partner such as Greenlane or Jupiter is skipped entirely because the CCELL-branded products are drop-shipped from Smoore in China directly to customers in the United States."[3]

44.    As a result, the Defendants' Vape supply chain in the United States looks something like the below graphic (**Figure 2**):



*Figure 2: Defendants' United States Vape Supply Chain*

45.    Notwithstanding their status as competitors, Smoore has entered into horizontal agreements with its Authorized Distributors that bars each from competing with one another and with Smoore.

### 3.    *Vapes Available in the United States Today*

46.    Vapes are comprised of multiple parts—typically a mouthpiece, a cartridge, a tank/reservoir, a heating element, and a battery—that are sold either in their assembled form, or in their component parts.

47.    The most common Vape is the industry-standard "510 threaded cartridge,"[4] which accounts for the vast majority of Vape sales in the United States.

---

[3]    ITC Decision at 97.
[4]    The "510 threaded" refers to the ten threads at 0.5mm intervals on the cartridge.

Other Vapes sold in the United States include "Pod Systems," and "All-in-Ones" (or "AIOs").

48.    The below images show (a) the complete assembly for a "510-threaded" Vape on the left and its separate components on the right (**Figure 3**), (b) the complete assembly for a "Pod System" Vape on the left and its components on the right (**Figure 4**), and (c) examples of AIO Vapes (**Figure 5**).  Defendants sell each of these Vape styles directly to members of the putative Class.



***Figure 3: 510-Threaded Vape Assembly***



***Figure 4: Pod System Vape Assemblies***



***Figure 5: All-In-One Vapes***

## B. <u>Defendants' Unlawful Horizontal Conspiracy</u>

49.    Smoore has been a horizontal competitor with its Authorized Distributors in the wholesale distribution of Vapes sold in the United States throughout the Class Period.

50.    No Defendant is a parent, subsidiary, or affiliate of any other Defendant,

and no Defendant has entered into a joint venture with another Defendant with regard to the sale of Vapes. Consequently, each Defendant would, absent the alleged conspiracy, be a competitor with one another in the sale of Vapes in the United States.

51.     Smoore and each of its Authorized Distributors has entered into a **written and signed** Distributor Agreement that is, on its face, *per se* illegal inasmuch as these agreements contain terms that (a) set minimum wholesale prices for Vapes, and (b) bar the Defendants for competing with one another.

52.     Each Defendant knows that every other Defendant also agreed to the terms of the Distributor Agreement. Indeed, Smoore and its Authorized Distributors held in-person meetings, including one in Los Angeles in 2019, where they confirmed that the Defendants had agreed not to compete with one another.

53.     The Defendants effectuated and enforced their illegal agreement in at least four ways.

54.     <u>First</u>, Defendants—horizontal competitors—agreed to exchange with one another, on a monthly basis, information on their prices and customers. This real-time price and customer exchange allowed the Defendants to quickly identify potential "cheating" and bring the violators into compliance.

55.     <u>Second</u>, Defendants trained their employees that they were not to compete with one another in the sale of Vapes.

56.     <u>Third</u>, the Authorized Distributors lodged complaints about potential cheating with Smoore, who would then bring the alleged violator back into the fold.

57.     <u>Fourth</u>, Smoore enforced compliance by the Authorized Distributors through required security deposits that could be forfeited in the event of non-compliance.

58.     These monitoring and enforcement mechanism ensured that none of the Defendants could, at least for an extended period of time, cheat on each other by, for example, charging lower prices or stealing another Defendant's customers.

### C.    The Defendants' Other Exclusionary Conduct

59.    Smoore furthered the anticompetitive restraints alleged herein by engaging in other exclusionary conduct, including, for example, pursuing objectively baseless litigation before the International Trade Commission ("ITC") against dozens of would-be competitors.

60.    Specifically, in 2021, Smoore filed its ITC Complaint, alleging infringement of three U.S. Patents related to oil-vaping cartridges, including U.S. Patent Nos. 10,791,762 (the "'762 Patent"), 10,791,763 (the "'763 Patent"), and 10,357,623 (the "'623 Patent"). Smoore's complaint listed thirty-eight (38) proposed respondents, which was all or virtually all of Smoore's would-be competitors in the United States.

61.    The ITC instituted an investigation, *Certain Oil-Vaping Cartridges, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1286 (the "ITC Investigation"), by publication of a notice in the Federal Register (86 Fed. Reg. 62567-69) on November 10, 2021.

62.    In February 2022, ITC Chief Administrative Law Judge Clark S. Cheney issued an Initial Determination. In relevant part, Judge Cheney concluded as follows:[5]

(a)    Claims 1, 2, 3, 5, and 6 of the '623 Patent had not been infringed by the respondents and were invalid as indefinite;

(b)    Claims 1, 2, and 7 of the '762 Patent had not been infringed by the respondents;

(c)    Claims 1 and 11 of the '763 Patent had not been infringed by the respondents;

(d)    Smoore had failed to satisfy both the technical and economic

---

[5]    ITC Decision ¶¶ 4-15.

prongs of the domestic injury requirement with respect to all three patents; and

(e)    The '623 Patent was "unenforceable due to inequitable conduct."

63.    As to the respondents' non-infringement of the '623 Patent, '762 Patent, and '763 Patent, Judge Cheney found that Smoore had failed to supply sufficient evidence to prove that the respondents' Vapes infringed on its patents, faulting Smoore for providing the ITC with "meaningful analysis or discussion" and instead resting its case on "only conclusory allegations of infringement followed by lengthy string citations (often more than ten lines long) that fail to connect individual product features to the claim limitations."[6]

64.    As to the unenforceability of the '623 Patent, Judge Cheney found that Smoore had fraudulently obtained this patent.[7] Specifically, Judge Cheney found as follows:[8]

(a)    Smoore employee Wenjian Qi arranged for his wife's company, Shenzhen Detail Technology Company, Ltd., to purchase an abandoned patent application (for the '553 patent);

(b)    Mr. Qi subsequently worked with California-based patent prosecutor Andrew Cheng to revive abandoned '553 patent;

(c)    Mr. Cheng "knowingly submitted a false declaration about the reason the '553 application was abandoned";

(d)    "The '623 patent issued from continuations of the revived '553 application and was ultimately sold to Smoore";

(e)    "The evidence demonstrates clearly and convincingly that Mr. Cheng knowingly filed a false declaration with the Patent Office

---

[6]    ITC Decision at 55-60.
[7]    This finding is proof that the ITC Action "objective baseless" from the outset. *See Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 538 (9th Cir. 1995).
[8]    ITC Decision at 90-94.

and that the false declaration was material to the grant of patent rights maturing from the '553 application";

    (f)    "[T]he '623 patent is unenforceable due to inequitable conduct"; and

    (g)    "[T]here can be no finding of violation of section 337 based on allegations of infringement of the '623 patent."

65.    Smoore's prosecution of these three patents before the ITC, including of one that was fraudulently obtained, largely achieved Smoore's true intent in filing the suit: stopping legal competition from these would-be competitors.

66.    Specifically, during the course of the ITC investigation, thirteen (13) respondents were terminated based on consent orders; six (6) respondents were terminated due to settlements with Smoore; two (2) respondents were terminated based on withdrawal of allegations in the complaint; and six (6) respondents were found in default. This is shown in the below table (**Table 1**):

### *Table 1: Status of ITC Respondents*

| No. | ITC Respondent | Address (From ITC Complaint) | Source |
|---|---|---|---|
| **Consent Orders** | | | |
| 1 | headcandysmokeshop.com | 200-2288 No. 5 Road Richmond, BCV6X 2T1 Canada | *See* Order No. 9 (Dec. 16, 2021) |
| 2 | Head Candy Enterprise Ltd. | 121-618 East Kent Ave. South Vancouver, BC V5X 0B1, Canada | |
| 3 | ZTCSMOKE USA Inc. | 599B West John Sims Pkwy Niceville, FL 35278 | *See* Order No. 10 (Dec. 20, 2021) |
| 4 | dcalchemy.com | 10645 N. Tatum Blvd. Suite 200 Phoenix, AZ 85028 | *See* Order Nos. 12 and 13 (Dec. 21, |
| 5 | DC Alchemy, LLC | | |

| 6 | Royalsupplywholesale.com | 5432 Geary Blvd. Suite 321 San Francisco, CA 94121 | 2021) |
|---|---|---|---|
| 7 | Customcanabisbranding.com | | |
| 8 | CLK Global, Inc. | | |
| 9 | Ygreeninc.com | 671 Brea Canyon Road Suite 2 Walnut, CA 91789 | *See* Order No. 15 (Jan. 10, 2022) |
| 10 | Ygreen Inc. | | |
| 11 | Cannary Packaging Inc. | 9-1415 Hunter Court Kelowna, BC, V1X 6E6, Canada | *See* Order Nos. 16 and 17 (Jan. 18, 2022) |
| 12 | Cannary LA | 2901 Gardena Avenue Signal Hill, CA 90755 | |
| 13 | The Calico Group Inc. | 2801 Via Fortuna Suite 675 Austin, TX 78746 | *See* Order No. 46 (Jan. 31, 2023) |
| **Settlements** | | | |
| 1 | shopbvv.com | 1251 Frontenac Road, Suite 150 Naperville, IL 60563 | *See* Order No. 29 (June 7, 2022) |
| 2 | Best Value Vacs, LLC | | |
| 3 | Jonathan Ray Carfield d/b/a AlderEgo Wholesale, AlderEgo Holdings, Inc. and AlderEgo Group Limited a/k/a AVID Holdings Limited | Apt. 2702, Unit 1, Block A Tianyuan Building 5, Gangxia Center Futian District, Shenzhen 518016 Guangdong, China | *See* Order Nos. 33 and 34 |
| 4 | Hanna Carfield | PO Box 7010 Tacoma, Washington 98417 | |
| 5 | Atmos Nation LLC | 4800 SW 51st Street, Suite 106 Davie, FL 33314 | |
| 6 | AlderEgo Group Limited | Room 21, Unit A, 11F Tin Wui Industrial Building No. 3 Hing Wong Street Tuen Mun, N.T., Hong Kong | |
| **Complaint Withdrawn** | | | |
| 1 | International Vapor Group, LLC | 14300 Commerce Way Miami Lakes, FL 33016 | *See* Order No. 17 (Jan. 21, 2022) |

19

| | | | |
|---|---|---|---|
| 2 | BBTank USA, LLC | 213 Secor Road #583<br>Lambertville, MI 48144 | *See* Order No. 20 (Feb. 23, 2022) |
| **Default** | | | |
| 1 | Glo Extracts | 6230 Wilshire Blvd.<br>Los Angeles, CA 90048 | *See* Notice by the ITC (July 19, 2023) |
| 2 | BulkCarts.com | 42010 Koppernick Road Suite 114<br>Canton, MI 48187 | *See* Order No. 42 (Jan. 23, 2023) |
| 3 | Greenwave Naturals LLC | 11800 Silkwood Cove<br>Austin, TX 78739 | |
| 4 | Cartridgesforsale.com | P.O. Box 971024<br>Ypsilanti, MI 48197 | |
| 5 | HW Supply, LLC | 324 Airport Industrial Dr.<br>Ypsilanti, MI, 48198 | |
| 6 | Obsidian Supply, Inc. | 16 Technology Dr. #103<br>Irvine, CA 92618 | |
| **No Violation Found** | | | |
| 1 | Bold Crafts, LLC d/b/a Bold Carts and BoldCarts.com | 420 Goddard Ave.<br>Irvine, CA 92618 | *See* ITC Decision |
| 2 | The Blinc Group Inc. | 40 Fulton Street<br>6 Floor<br>New York, NY 10038 | |
| 3 | Next Level Ventures, LLC | 3131 Western Ave.<br>Suite 325<br>Seattle, WA 98121 | |
| 4 | Advanced Vapor Devices, LLC | 1230 Long Beach Ave.<br>Los Angeles, CA 90021 | |
| 5 | avd710.com | 3131 Western Ave<br>Suite 325<br>Seattle, WA 98121 | |
| 6 | A&A Global Imports, Inc. d/b/a Marijuana Packaging | 3359 East 50th Street<br>Vernon, CA 90058 | |
| 7 | Bulk Natural, LLC d/b/a True Terpenes | 524 E Burnside Street<br>Suite 600<br>Portland, OR 97214 | |
| 8 | Brand King, LLC | 717 Del Paso Road<br>Sacramento, CA 95834 | |
| 9 | Greentank Technologies Corp. | 102-135 Liberty Street<br>Toronto, ON, M6K 1A7, | |

20

| | | Canada | |
|---|---|---|---|
| 10 | iKrusher.com | 11818 Clark Street<br>Arcadia, CA 91006 | |

67.    At least some of the respondents who resolved the ITC action by consent decree or settlement appear to have agreed to stop competing with the Defendants as a condition of being dropped from the ITC action.

68.    Undeterred by the ITC's conclusion that the respondents did not infringe on these three patents, Smoore has filed lawsuits against some or all of the would-be competitors who it did not force out of competition through the ITC suit based on some or all of the very same patents that the ITC concluded had not been infringed by these potential competitors.[9]

**D.    The Structure and Characteristics of the Wholesale Distribution of Vapes in the United States**

69.    The structure and other characteristics of the wholesale distribution market for Vapes in the United States make it conducive to anticompetitive conduct among the Defendants and make collusion particularly attractive.

**1.    The Market for Vapes in the United States is Highly Concentrated, with Defendant Smoore Being the Dominant Manufacturer and the Authorized Distributors Being the Dominant Distributors.**

70.    The presence of a small group of major sellers is one of the conditions that the DOJ has identified as being favorable to collusion. Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

71.    Smoore is the dominant manufacturer of Vapes sold in the United States, and the Authorized Distributors are the dominant distributors of Vapes sold

---

[9]    *See, e.g., Shenzhen Smoore Tech. Co., Ltd. v. Next Level Ventures, LLC & Advanced Vapor Devices, LLC*, Case No. 2:22-cv-7646 (C.D. Cal. Oct. 19, 2022); *Shenzhen Smoore Tech. Co., Ltd. v. A&A Global Imports, Inc.*, Case No. 2:22-cv-8014 (C.D. Cal. Nov. 2, 2022); *Shenzhen Smoore Tech. Co., Ltd. v. Greentank Tech. Corp.*, Case No. 2:22-cv-7638 (C.D. Cal. Oct. 19, 2022); *Shenzhen Smoore Tech. Co., Ltd. v. The Calico Group Inc.*, Case No. 2:22-cv-7633 (C.D. Cal. Oct. 19, 2022).

in the United States. Indeed, Smoore claims that its "CCELL" Vapes are "a technology brand and global innovator in the portable vaporizer space that revolutionized the industry by introducing the ceramic heating component," was established by Smoore in 2016 and has since become one of the world's largest vaporizer suppliers.

72.  This market power allows the Defendants to control prices and exclude competitors by means other than competition on the merits.

### 2.  Barriers to Entry are High

73.  A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Such high barriers to entry exist here.

74.  The development and manufacture of Vapes requires a lengthy research and development process, expensive equipment and facilities. In addition, the distribution of Vapes to customers is also expensive inasmuch as it requires costly sales and distribution infrastructure, including a network of salespeople and physical infrastructure such as warehouses to hold inventory and inventory carrying costs. Finally, sales of Vapes are driven, in large part, by personal relationships, further making it difficult for new entrants to gain share.

75.  The Defendants' agreement to only sell one another's Vapes further elevated these already high barriers to entry.

76.  In addition, Smoore's scheme—backed by some or all of the Authorized Distributors—to pursue ITC litigation against would-be competitor acted as a further barrier to entry. Indeed, as set forth above, the ITC Complaint had the effect of removing numerous potential competitors from the market.

77.  The high barriers to entry in the manufacture of Vapes make it unlikely

that supra-competitive prices would result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

### 3.     Demand for Vapes is Inelastic

78.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchase substitute products or decline to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering product substitution and lost sales revenue.

79.     Industries with inelastic demand are thus more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices.

80.     Demand for Vapes by Plaintiff and the Class is inelastic within the pricing ranges observed for this product in the United States during the Class Period. Because the cost of Vapes is small relative to the overall cost of Vapes filled with cannabis oil, small but significant supra competitive prices has been imposed on Plaintiff and the Class by Defendants without an offsetting loss in sales.

### 4.     There Were Numerous Opportunities for the Defendants to Collude

81.     The DOJ notes that competitors who "know each other well through social connections, trade associations, [and] legitimate business contacts" are more likely to collude.

82.     <u>First</u>, and as set forth above, the Defendants met in-person to coordinate their illegal scheme.

83.     <u>Second</u>, the contractual relationships established among the Defendants provided a direct and structured opportunity for collusion. As stipulated in the

Distributor Agreements, the requirement for Authorized Distributors to provide one another with monthly reports on customer activity and pricing not only allowed the Defendants to monitor compliance but also provided an ongoing opportunity to communicate and collude. Indeed, these reports and communications facilitated the exchange of sensitive market information and ensured that all parties remained aligned in their goal of restraining competition.

### E.    Interstate Trade and Commerce

84.    The Defendants sell Vapes in the United States in a continuous and uninterrupted flow of interstate commerce, including in this District.

85.    The Defendants' business substantially affects interstate commerce in the United States and affects a substantial volume of trade and commerce in various states in the United States.

86.    The Defendants' businesses substantially affect interstate commerce and have caused antitrust injury to Plaintiff and members of the Class.

## VII.    TOLLING OF THE STATUTES OF LIMITATIONS

### A.    Plaintiff Could Not Have Discovered Its Injury Within Four Years of Filing this Complaint

87.    Plaintiff and the Class had neither actual nor constructive knowledge, and no reason to believe, that they paid prices for Vapes that were affected by the Defendants' illegal conduct in the four years prior to the filing of this Complaint.

88.    By its very nature, the alleged misconduct of Defendants was self-concealing. The Distributor Agreements, internal communications, and monitoring and enforcement mechanisms between the Defendants were not public information, rendering impossible any ascertainment of their specific misconduct.

### B.    In the Alternative, the Defendants Fraudulently Concealed their Conspiracy

89.    The Defendants fraudulently concealed their scheme by not disclosing their conspiracy.

---

90.    The Ninth Circuit has held that "[a] statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). Invocation of this doctrine requires some affirmatively misleading act by the antitrust defendant. *See In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 782 F. Supp. 487, 489 (C.D. Cal. 1991).

91.    In the June 29, 2020 Global Offering memorandum—Smoore's parent inaccurately represented that Smoore's distributors had autonomy over their pricing decisions: "We generally sell our products to distributors at around 34% to 43% of the retail price ***recommended*** by us. The prices at which we sell our products to the distributors are determined on a cost-plus basis. We will offer different levels of discounts to distributors based on their distributorship types and sales network coverage on a case-by-case basis. We ***provide guidance regarding price range*** as well as product promotional discount policies and programs to our distributors according to their tier. Our ***distributors should follow our guidance and formulate the final selling price based on their operational performance***." This assertion was false and materially misleading because the true facts were that the Defendants had agreed that pricing to Plaintiff and the Class were set by agreement rather than unilaterally.

92.    In addition, the Defendants fraudulently concealed their conspiracy by offering pretextual explanations for the pricing of their Vapes. For example, Smoore has claimed that its Vapes are more expensive than competitors' Vapes because they are better products, and Defendant 3Win claims on its website that Smoore's Vapes are expensive because they "are of the highest standard and quality in the industry." These public-facing explanations for the higher prices for the Defendants' Vapes fraudulently concealed the true reason they were more expensive: the Defendants'

anticompetitive agreements.

### C.    In the Alternative, the Continuing Violation Doctrine Applies

93.    In the alternative, Plaintiff and the Class are entitled to at least four years of damages from the filing of this suit. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (2014) ("Turning first to the continuing violation exception, the Supreme Court and federal appellate courts have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act.").

## VIII.  CLAIM FOR RELIEF

**COUNT ONE**
**Violation of Section 1 of the Sherman Act**
**(15 U.S.C. §§ 1, 3)**

94.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

95.    Beginning some time before but no later than November 16, 2016, the exact date being unknown to Plaintiff and exclusively within the knowledge of the Defendants, the Defendants entered into a continuing horizontal contract, combination and conspiracy to unreasonably restrain trade and commerce in violation the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating competition for the pricing of Vapes directly sold to purchasers in the United States and its territories.

96.    In particular, the Distributor Agreements constitute horizontal agreements in restraint of trade that were entered into for the purpose of combining and conspiring to raise, fix, maintain, or stabilize the prices of Vapes sold to purchasers in the United States and its territories during the Class Period.

97.    The Defendants activities constitute a *per se* violation of Sections 1 and 3 of the Sherman Act.

98.    The Defendants' anticompetitive and unlawful conduct has directly and proximately caused injury to Plaintiff and members of the Class by restraining competition and raising, maintaining and/or stabilizing the price of Vapes at levels above what would have occurred if competition had prevailed.

99.    As a direct and proximate result of the Defendants' conduct, Plaintiff and the Class were damaged in an amount to be proven at trial, and Plaintiff accordingly seeks treble damages, costs, and reasonable attorney's fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff serving as the Class Representative and its counsel serving as Class Counsel;

B.    The Defendants have contracted, engaged in anticompetitive conduct in violation of the Sherman Act;

C.    Plaintiff and the Class have been injured in its business and property as a result of the Defendants' violations;

D.    Plaintiff and the Class are entitled to recover three-fold damages and/or restitution, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial;

E.    Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate;

F.    Plaintiff and the Class are entitled to injunctive relief suitable to remedy the Defendants' past and ongoing restraint of trade, including the following:

i.   A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of the Defendants; and

ii.  Issuance of a permanent injunction against the Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

G.   The Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification of this action and their rights to the Class members;

H.   Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

I.   Plaintiff and the Class receive such other or further relief as may be just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint that are so triable.

DATED:      February 11, 2025

By: */s/ Christopher L. Lebsock*
Christopher L. Lebsock (#184546)
**HAUSFELD LLP**
580 California Street
12th Floor
San Francisco, CA 94101
Telephone: (415) 633-1908

Facsimile: (415) 358-4980
clebsock@hausfeld.com

Nathaniel C. Giddings (*pro hac vice* forthcoming)
**HAUSFELD LLP**
888 16th Street NW
Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7214
ngiddings@hausfeld.com

Joshua H. Grabar (*pro hac vice* forthcoming)
Julia C. Varano (*pro hac vice* forthcoming)
**Grabar Law Office**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 267-507-6085
Fax: 267-507-6048
jgrabar@grabarlaw.com
jvarano@grabarlaw.com

*Counsel for Earth's Healing, Inc.*