JAIKARAN SINGH, CA Bar No. 201355
  jsingh@foley.com
**FOLEY & LARDNER LLP**
11988 EL CAMINO REAL, STE. 400
SAN DIEGO, CA 92130-2594
TELEPHONE:  858.84736700
FACSIMILE:   858.792.6773

DIANE R. HAZEL (*Pro Hac Vice*)
  dhazel@foley.com
**FOLEY & LARDNER LLP**
1144 15th Street, STE 2200
DENVER, CO  80202
TELEPHONE:  720-437.2034
FACSIMILE:  720.437.2200

Attorneys for Defendants Jupiter Research,
LLC; 3Win Corp.; Greenlane Holdings, Inc.;
and CB Solutions, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARTH'S HEALING, INC.; REDBUD ROOTS, INC.; and SUMMIT INDUSTRIAL SOLUTIONS, LLC,<br><br>                                   *Plaintiffs*,<br><br>              v.<br><br>SHENZHEN SMOORE TECHNOLOGY CO. LTD.; JUPITER RESEARCH LLC; GREENLANE HOLDINGS, INC.; 3WIN CORP; CB SOLUTIONS, LLC d/b/a CANNA BRAND SOLUTIONS,<br><br>                                   *Defendants*. | Lead Case: 3:25-cv-01428-VC<br><br>**DISTRIBUTORS' MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>DATE: August 14, 2025<br>TIME: 10:00 AM<br>COURTROOM: 04<br><br><br>Judge:      Hon. Vince Chhabria |

## <u>NOTICE OF MOTION AND MOTION</u>

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 14, 2025, or as soon thereafter as this matter may be heard in Courtroom 04 of the above-captioned Court, located at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendants Jupiter Research, LLC, 3Win Corp, CB Solutions, LLC, and Greenlane Holdings, Inc. (collectively, "Distributors"), hereby move this Court for an order dismissing all claims contained in the Direct Purchaser Plaintiffs' Consolidated Class Action Complaint (ECF 63) ("CAC") filed by Plaintiffs Earth Healings, Inc. ("Earth's Healing"), Redbud Roots Inc. ("Redbud"), and Summit Industrial Solutions LLC ("Summit," and with Earth's Healing and Redbud, the "DPPs"), with prejudice, for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), on the following grounds:

1. DPPs cannot plausibly allege a Sherman Act claim, and this Court lacks subject matter jurisdiction over DPPs' Sherman Act claims, because DPPs cannot meet the interstate commerce requirement of the Sherman Act.

2. DPPs lack antitrust standing and antitrust injury to sustain their federal Sherman Act and state law claims.

3. DPPs fail to state a *per se* Section 1 claim under the Sherman Act because their allegations challenge a lawful vertical distribution system.

4. DPPs fail to state a Section 1 claim under the rule of reason because they do not allege direct or circumstantial evidence of an unlawful conspiracy and competitive harm in a plausibly defined relevant market.

5. DPPs fail to state a claim under the Cartwright Act for the same reasons their claim fails under the Sherman Act.

6. DPPs fail to state a claim under the California Unfair Competition Law because they do not plead specific unlawful conduct related to that claim.

7. DPPs' Sherman Act and California claims are time barred by relevant statutes of limitations.

Distributors' Motion is based on this Notice of Motion and Motion, the accompanying

Memorandum of Points and Authorities, the pleadings and records on file in this action, and such additional authority and argument as may be presented at the hearing on this Motion.

/s/ Jaikaran Singh
Jaikaran Singh
FOLEY & LARDNER LLP
11988 El Camino Real, Suite 400
San Diego, CA 92130
858-847-6700
Email: jsingh@foley.com


/s/ Diane R. Hazel
Diane Hazel (admitted PHV)
FOLEY & LARDNER LLP
1144 15th Street, Suite 2200
Denver, CO 80202
720-437-2034
Email: dhazel@foley.com

Attorneys for Defendants Jupiter Research, LLC;
3Win Corp.; Greenlane Holdings, Inc.; and CB
Solutions, LLC

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................1

I.      INTRODUCTION ....................................................................................................1

II.     SUMMARY OF DPPS' FACTUAL ALLEGATIONS................................................2

III.    ISSUES TO BE DECIDED ......................................................................................4

IV.     LEGAL STANDARD................................................................................................4

V.      ARGUMENT ...........................................................................................................5

        A.      THE SHERMAN ACT DOES NOT APPLY BECAUSE THERE IS NO
                INTERSTATE MARKET FOR CANNABIS .................................................5

                i.      DPPs Cannot Assert a Sherman Act Claim (Counts I and II)
                        Because They Cannot Satisfy the Interstate Commerce
                        Requirement. ...................................................................................6

                ii.     DPPs Cannot Plead Antitrust Injury, and Thus Lack Antitrust
                        Standing under the Sherman Act, Because DPPs Allege They
                        Operate Cannabis Businesses. ..........................................................7

        B.      DPPS FAIL TO STATE A CLAIM UNDER SECTION 1 OF THE SHERMAN
                ACT.............................................................................................................8

                i.      DPPs Do Not Plausibly Plead a *Per Se* Violation under the
                        Sherman Act Relating to the Alleged Resale Price Maintenance or
                        Customer Allocation. .......................................................................8

                ii.     DPPs Do Not Plausibly Allege an Unlawful Conspiracy Under the
                        Rule of Reason. ...............................................................................9

        C.      DPP SUMMIT CANNOT PURSUE ITS CALIFORNIA OR SHERMAN ACT
                CLAIMS BECAUSE IT IS IN SUSPENDED TAX STATUS UNDER
                CALIFORNIA LAW AND, THEREFORE, CANNOT SUE. ...................17

        D.      DPP SUMMIT'S CALIFORNIA CLAIMS FAIL AS A MATTER OF LAW.............17

        E.      DPPS' SHERMAN ACT AND CALIFORNIA CLAIMS ARE BARRED BY
                THE STATUTE OF LIMITATIONS. ..........................................................19

VI.     CONCLUSION.......................................................................................................20

Distributors' Motion to Dismiss
Case No. 3:25-cv-01428-VC

## TABLE OF AUTHORITIES

Federal Cases                                                                          Page(s)

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016)........................................................................................ 10

*Ajir v. Exxon Corp.*,
   185 F.3d 865 (9th Cir. 1999)........................................................................................... 9

*Alan Darush MD APC v. Revision LP*,
   2013 WL 1749539 (C.D. Cal. April 10, 2013) ........................................................... 18

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010)........................................................................................ 16

*Apple, Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ....................................................................... 14

*Applied Underwriters, Inc. v. Lara*,
   530 F. Supp. 3d 914 (E.D. Cal. 2021).......................................................................... 17

*Arcell v. Google, LLC*,
   2023 WL 5336865 (N.D. Cal. Aug. 18, 2023).............................................................. 7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................. 5, 16

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021).......................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................ 5, 8, 10

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
   182 F.3d 1096 (9th Cir. 1999)...................................................................................... 13

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012)........................................................................................ 9

*Brinkmeyer v. Washington State Liquor and Cannabis Bd.*,
   2023 WL 1798173 (W.D. Wash. Feb. 7, 2023) ............................................................ 6

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) .................................................................................................... 13

*Castaneda v. Saxon Mortg. Servs., Inc.*,
   687 F. Supp. 2d 1191 (E.D. Cal. 2009)........................................................................ 19

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
   868 F. Supp. 2d 876 (N.D. Cal. 2012) .......................................................................... 8

Distributors' Motion to Dismiss
Case No. 3:25-cv-01428-VC

*City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) ................................................................................................ 7

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) ........................................................................................... 17

*Community Elec. Serv. of Los Angeles, Inc. v. Nat'l Elec. Contractors Ass'n, Inc.*,
   869 F.2d 1235 (9th Cir. 1989) ........................................................................................... 17

*D'Augusta v. Am. Petroleum Inst.*,
   117 F.4th 1094 (9th Cir. 2024) .......................................................................................... 10

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ............................................................................................. 16

*Dimidowich v. Bell & Howell*,
   803 F.2d 1473 (9th Cir. 1986) ............................................................................................. 9

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*,
   848 F.2d 976 (9th Cir. 1988) .......................................................................................... 6, 7

*Flextronics, Int'l USA, Inc. v. Murata Mfg. Co., Ltd*,
   2020 WL 5106851 (N.D. Cal. Aug. 31, 2020) ................................................................. 12

*Garrison v. Oracle Corp.*,
   159 F. Supp. 3d 1044 (N.D. Cal. 2016) ............................................................................ 20

*Greencycle Paint, Inc. v. Paintcare, Inc.*,
   2016 WL 1402845 (N.D. Cal. Apr. 8, 2016) .................................................................... 18

*Gulf Oil Corp. v. Copp Paving Co.*,
   419 U.S. 186 (1975) ............................................................................................................ 6

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
   2016 WL 7479402, n.6 (C.D. Cal. July 7, 2016) ............................................................. 18

*In re Animation Workers Antitrust Litig.*,
   87 F. Supp. 3d 1195 (N.D. Cal. 2015) ........................................................................ 19, 20

*In re DRAM Indirect Purchaser Antitrust Litig.*,
   28 F.4th 42 (9th Cir. 2022) ........................................................................................... 11, 12

*In re Generic Pharms. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) ................................................................................ 12

*In re German Auto. Manufacturers Antitrust Litig.*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020) .............................................................................. 14

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............................................................................ 12

*In re Musical Instr. And Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015)................................................................................................ 11, 12

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010)...................................................................................................... 15

*Kelsey K. v. NFL Enters., LLC*,
  757 F. App'x 524 (9th Cir. 2018) .................................................................................................... 5

*Kowarsh v. Heckman*,
  2015 WL 2406785 (N.D. Cal. May 19, 2015) ............................................................................... 19

*Krehl v. Baskin-Robbins Ice Cream Co.*,
  664 F.2d 1348 (9th Cir. 1982)......................................................................................................... 9

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ........................................................................................................... 9, 15, 17

*Maple Flooring Mfrs. Ass'n v. United States*,
  268 U.S. 563 (1925) ....................................................................................................................... 12

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
  309 F. Supp. 2d 1156 (N.D. Cal. 2004) ......................................................................................... 7

*Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*,
  795 F.3d 1124 (9th Cir. 2015)................................................................................................... 8, 10

*Peridot Tree, Inc. v. City of Sacramento*,
  2024 WL 4857648 (E.D. Cal. Nov. 20, 2024) ................................................................................. 6

*PharmacyChecker.com v. Nat'l Ass'n of Bds. of Pharmacy*,
  2023 WL 2973038 (S.D.N.Y. Mar. 28, 2023) ................................................................................. 7

*PNY Techs., Inc. v. SanDisk Corp.*,
  2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ............................................................................... 16

*Reilly v. Apple Inc.*,
  578 F. Supp. 3d 1098 (N.D. Cal. 2022) .................................................................................. 13, 15

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
  532 F.3d 963 (9th Cir. 2008)........................................................................................................... 9

*Samsung Elecs. Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014)....................................................................................................... 20

*Siegler v. Sorrento Therapeutics, Inc.*,
  2019 WL 3532294 (S.D. Cal. Aug. 2, 2019) ........................................................................... 13, 14

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001)........................................................................................................... 5

*Stanislaus Food Products Co. v. USS-POSCO Industries*,
   782 F. Supp. 2d 1059 (E.D. Cal. 2011) ................................................................................ 11

*The Jeanery, Inc. v. James Jeans, Inc.*,
   849 F.2d 1148 (9th Cir. 1988) ............................................................................................... 8

*Tymar Distribution LLC v. Mitchell Grp. USA, LLC*,
   558 F. Supp. 3d 1275 (S.D. Fla. 2021) ................................................................................ 16

*Variscite, Inc. v. City of Los Angeles,
   et al.*, 2025 WL 433448 (C.D. Cal. Feb. 4, 2025) ................................................................. 6

*Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*,
   516 F. Supp. 2d 270 (S.D.N.Y. 2007) .................................................................................. 16

*Zenith Radio Cop. v. Hazeltine,
   Res.*, 401 U.S. 321 (1971) .................................................................................................... 19

State Cases

*Beverage v. Apple, Inc.*,
   101 Cal. App. 5th 736 (2024) ............................................................................................... 18

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) .......................................................................................................... 19

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*,
   200 Cal. App. 4th 480 (2011) ............................................................................................... 18

*Morrison v. Viacom, Inc.*,
   66 Cal. App. 4th 534 (Cal. 1998) ......................................................................................... 18

Federal Statutes

15 U.S.C. § 1 ................................................................................................................................ 6, 8

15 U.S.C. § 15b .............................................................................................................................. 19

State Statutes

Cal. Bus. & Prof. Code § 17208 (UCL) ....................................................................................... 19

Cal. Bus. & Prof. Code §§ 16750.1 .............................................................................................. 19

Federal Rules

Fed. R. Civ. P. 9(b) ....................................................................................................................... 20

Fed. R. Civ. P. 12(b)(1) .................................................................................................................. 5

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 4, 5

Fed. R. Civ. P. 17(b) ................................................................................................................ 17

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

DPPs bring this lawsuit to challenge what is, essentially, a lawful and procompetitive distribution system involving Shenzhen Smoore Technology Co. Ltd. ("Smoore") and the Distributors. DPPs allege that Smoore, a manufacturer of cannabis vaporizer devices, entered into vertical distribution agreements with several independent distributors, the Distributors, and that these agreements—because they contain pricing guidelines and other common distribution terms—somehow violate federal and California antitrust laws. But DPPs' claims rest on a fundamental misunderstanding of antitrust law. The Sherman Act and its state-law equivalents do not prohibit a manufacturer from deciding how to distribute its own products, much less distributors from complying with those decisions. To the contrary, vertical arrangements like those alleged here are routinely upheld as lawful because they promote interbrand competition, enhance efficiency, and benefit consumers.

DPPs' claims are also barred by a threshold legal defect: DPPs cannot meet the Sherman Act's interstate commerce requirement because DPPs, who allege they fill the relevant vaporizer devices with cannabis oil for resale only in states with legalized cannabis, engage in a business for which there is no interstate market under the Controlled Substances Act ("CSA"). Further, DPPs do not and cannot establish antitrust standing, which requires a legally cognizable injury to competition. There is no such thing in a market Congress has abolished. For these reasons alone, DPPs' federal claims should be dismissed.

But even if the Court were to overlook the CSA bar, the CAC still fails on its own terms. DPPs do not plausibly allege a conspiracy of any kind, let alone one subject to *per se* condemnation. DPPs rely mainly on the theory that Smoore's separate vertical agreements with the Distributors somehow constitute a horizontal conspiracy because Smoore occasionally sells directly to retailers. Such a "dual-distribution" model is both common and lawful, and the Ninth Circuit has repeatedly held that it does not convert resale price maintenance or other vertical agreements into *per se* unlawful horizontal collusion.

Nor do DPPs adequately plead a rule-of-reason claim. DPPs attempt to point to one industry meeting almost seven years ago between Smoore and certain Distributors as an "opportunity to collude" and suggest this one meeting confirms an unlawful agreement. But that is not enough. Mere opportunity, without well-pled facts suggesting an actual agreement, falls woefully short of the pleading standard. And,

Distributors' Motion to Dismiss
Lead Case No. 3:25-cv-01428-VC

in any event, the meeting in question took place well outside the applicable statute of limitations. Further, DPPs define an artificially narrow product market limited to Smoore's own brand of closed cannabis oil vaporizer systems, ignoring obvious substitutes such as other vaporization devices, pre-rolled products, edibles, and open-system products that compete for consumer demand. DPPs also allege an implausible nationwide geographic market despite acknowledging that the sale of cannabis remains illegal in multiple U.S. states and under federal law. These flaws alone are fatal to DPPs' market definition.  And DPPs do not, as they must, come close to alleging anticompetitive effects in any relevant market. At most, they allege harm to *intrabrand* competition in that prices for Smoore's own products were allegedly higher than DPPs would have preferred. That is not enough. Antitrust law protects *interbrand* competition.

The California-law claims brought by DPP Summit also should be dismissed. To start, DPP Summit is in a suspended tax status with the California Secretary of State and therefore barred from bringing litigation in California or federal court. This alone requires dismissal of DPP Summit's claims, but its state-law claims fail in any event. Like the federal claims, they rest on implausible conspiracy allegations and fail to allege facts sufficient to state a claim under the Cartwright Act or the California Unfair Competition Law. All DPPs' claims are also time-barred under the applicable statutes of limitations, and the CAC pleads no facts that would justify tolling.

In short, DPPs seek to improperly weaponize the antitrust laws to challenge lawful vertical agreements between a manufacturer and its distributors—agreements that courts have consistently upheld as procompetitive—merely because they want a better deal on Smoore's products. DPPs seek damages for alleged conduct in a market that federal law expressly forbids.  And they rely on labels and conclusions when antitrust pleading standards demand facts and economic plausibility. For these reasons, those set forth below, and in Smoore's separately filed motion to dismiss, the Complaint should be dismissed in its entirety and with prejudice as against the Distributors.

II.    **SUMMARY OF DPPS' FACTUAL ALLEGATIONS**

Distributors are wholesale distributors of, among other things, certain "CCELL"-branded closed cannabis vaporizer systems and components (which DPPs define as "Vapes") manufactured by Smoore. CAC at 1. According to DPPs, the Vapes were introduced into the United States in 2016 and were created specifically to "handle . . . highly viscous cannabis oils" in a way that pre-existing nicotine vaporizer

systems could not. *Id.* ¶¶ 44-46. Smoore allegedly distributes Vapes in the United States in two ways: (1) sales made directly to cannabis oil and extract producers like DPPs, who then "sell them to licensed retail shops (or, if vertically integrated, directly to consumers)"; or (2) sales made to Smoore's wholesale distributors (*e.g.,* the Distributors), who then sell to cannabis oil and extract producers like DPPs. *See id.* ¶¶ 64, 66. Thus, DPPs contend that Smoore operates a "dual distribution" channel. *Id.* ¶¶ 3, 64, 66. DPPs, however, do not allege when Smoore began making "direct" sales to cannabis producers. *See id.*

Distributors sell these Vapes manufactured by Smoore both "in their assembled form" and "in their component parts." *Id.* ¶¶ 70, 73. DPPs contend there are three iterations of the "fully assembled" Vapes: (1) a reusable "510-threaded" Vape; (2) a "Pod System" Vape; and (3) an "All-In-One" Vape. *Id.* ¶¶ 71-72. For component parts, DPPs allege the Vapes typically include "a mouthpiece, a cartridge, a tank/reservoir, a heating element, and a battery." *Id.* ¶ 70. DPPs appear to claim—though it is not clear—that each form of fully assembled Vape has these same component parts, though DPPs do not specify if component parts must be from the same manufacturer to form a functioning vape. *See id.* ¶¶ 70-73. DPPs allege that the relevant product market here includes not only all three forms of fully assembled Vapes, but also, apparently, each individual, disassembled component part as a saleable product. *See id.* ¶ 150. DPPs contend the relevant geographic market here "is the United States." *Id.* ¶ 156.

At some undefined point in time, Smoore allegedly accounted for "roughly 80%" of all closed cannabis vaporizer systems and components sold in the United States. *Id.* ¶ 52. For the Distributors, DPPs allege market share percentages related to the sale of Smoore's CCELL-branded Vapes for an unspecified period for only two of the four Distributors—Jupiter (allegedly "40-50%") and Greenlane, initially through KushCo (allegedly "25-30%"). *Id.* ¶¶ 50, 60.

DPPs contend each Distributor allegedly memorialized its commercial relationship with Smoore via a separate distribution agreement authorizing the individual Distributor to purchase and resell Vapes. *Id.* ¶ 6. DPPs do not allege when each Distributor entered into its individual distribution agreement with Smoore. But DPPs' allegations suggest the effective dates of these agreements differ across Distributors. *See id.* ¶¶ 49, 54, 57, 59. According to DPPs, Jupiter began selling Vapes in 2016; 3Win in November 2016; CB Solutions in 2017; and KushCo (now Greenlane) in January 2018. *Id.*

DPPs allege that "some or all" of the distribution agreements include provisions that: (i) "directly

or incorporated by reference . . . set[] minimum wholesale prices for CCELL-branded Vapes," *id.* ¶ 6.; (ii) required "monthly sharing of confidential customer names and price information with Smoore," *id.* ¶ 8; and (iii) required security deposits from each Distributor from which Smoore could deduct for not following Smoore's policies, *id.* DPPs also allege that, through the distribution agreements or otherwise, "Smoore and each of the Distributors agreed not to compete for each others' (including Smoore's) customers." *Id.* ¶ 6. According to DPPs, this alleged agreement was implemented via Smoore and the Distributors training their employees to follow Smoore's minimum wholesale price guidelines and not compete for each other's customers, in part evidenced by a single in-person conference in Los Angeles, California "in 2018 and/or 2019." *See id.* ¶¶ 82-91. Smoore allegedly "policed" compliance through the Distributors "reporting . . . potential violations to Smoore." *Id.* ¶ 8. From this, DPPs conclude Smoore and the Distributors collectively engaged in an unlawful conspiracy that "began no later than December 1, 2016" even though most of the Distributors were not selling CCELL-branded Vapes at that time. *Id.* ¶ 5.

Each of the three DPPs claims they purchased unfilled Vapes (*i.e.*, cannabis oil vaporizer systems and components **without** cannabis oil) from Smoore and the Distributors—but do not identify which Defendants they purchased from—filled those Vapes with cannabis oil or extract, and resold the now-filled Vapes either to licensed retail dispensaries or individual consumers "during the Class Period" from "December 1, 2016, until the effects of the anticompetitive conduct ceased." *Id.* ¶¶ 19-21, 31, 63-64.

## III.    ISSUES TO BE DECIDED

Whether DPPs (1) meet the interstate commerce requirement of the Sherman Act (Count I); (2) have antitrust standing and plausibly plead that Smoore and each Distributor entered a contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (Counts I and II); (3) plausibly plead antitrust injury and that Smoore and each Distributor entered a combination of capital, skill, or acts to unreasonably restrain trade and commerce in violation of the California Cartwright Act (Count III); and (4) plausibly plead conduct that constitutes an unfair business practice under the California Unfair Competition Law (Count IV).

## IV.    LEGAL STANDARD

A court must dismiss claims that "fail[] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A plaintiff can only avoid dismissal when its pleading alleges "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory allegations cased in the form of factual allegations like those alleged here. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The plausibility threshold is particularly important in modern antitrust litigation, because "only by taking care to require allegations that reach the level suggesting conspiracy [can courts] hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence to support a § 1 claim." *See Twombly*, 550 U.S. at 559 (cleaned up); *see also Kelsey K. v. NFL Enters., LLC,* 757 F. App'x 524 (9th Cir. 2018) (same). A court also may dismiss a complaint, or any claim, for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

## V.  ARGUMENT

### A.  The Sherman Act Does Not Apply Because There Is No Interstate Market for Cannabis

Even if DPPs' allegations were true, which Distributors dispute, the Sherman Act and federal courts are not the appropriate legal vehicles for DPPs to use in pursuing their claims. DPPs cannot meet the Sherman Act's threshold interstate commerce requirement—and do not have antitrust standing—because they operate cannabis businesses that, pursuant to the Controlled Substances Act (the "CSA"), have no interstate market.[1] 21 U.S.C. §§ 841; 812(c)(Schedule I)(c)(10). This is fatal to DPPs' Sherman Act claims because DPPs themselves admit that they purchase the Vapes at issue here and "then fill the empty Vapes with [cannabis] oils or extracts" and "sell them to *licensed* retail shops (of if vertically integrated, directly to consumers)," which obviously only can occur in states that have legalized the retail sale of cannabis. CAC ¶ 64(c). Because DPPs operate cannabis businesses for which no interstate market exists, and likewise admit they sell only within states that have authorized retail cannabis operations, *id.*, they cannot avail themselves of the Sherman Act. And, for similar reasons, DPPs cannot plausibly plead they suffered antitrust injury. Put simply, the Sherman Act is not the proper substantive law through which DPPs can pursue their claims of alleged anticompetitive conduct impacting the cannabis industry. Rather,

---

[1] Pursuant to Rule 12(b)(6), Defendants make this argument limited only to the facts as pleaded by DPPs. Defendants do not agree or concede as a matter of fact or law that any vaporizing devices they sell are subject to the CSA or unlawful thereunder.

where there is no interstate commerce at issue and therefore federal law does not apply (as is the case here for the reasons described below), the laws of states that have legalized cannabis should serve as DPPs' only potential avenue for recourse. As a result, Counts I and II must be dismissed.

> **i.    DPPs Cannot Assert a Sherman Act Claim (Counts I and II) Because They Cannot Satisfy the Interstate Commerce Requirement.**

Sherman Act claims require the existence of interstate commerce, which "is both a substantive element of a statutory violation and a prerequisite for federal court jurisdiction." *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 979 (9th Cir. 1988); *see also* 15 U.S.C. § 1 (prohibiting "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states[.]"); *cf. Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1975) (affirming dismissal of Sherman Act claim for lack of requisite nexus with interstate commerce).

By enacting the CSA in 1971, Congress stated a clear intent that no interstate cannabis market exists. *Brinkmeyer v. Washington State Liquor and Cannabis Bd.*, 2023 WL 1798173, at *13 (W.D. Wash. Feb. 7, 2023) (holding that the dormant Commerce Clause does not apply to cannabis market because "***Congress has clearly stated its intent for no interstate cannabis market to exist***") (emphasis added); *Peridot Tree, Inc. v. City of Sacramento*, 2024 WL 4857648, at *7 (E.D. Cal. Nov. 20, 2024) (same); *Variscite, Inc. v. City of Los Angeles et al.*, 2025 WL 433448, at *3 (C.D. Cal. Feb. 4, 2025) (same). The businesses DPPs allege they are engaged in—*i.e.*, the purchase of unfilled Vapes and DPPs' subsequent filling of those Vapes with cannabis and resale to licensed cannabis retailers in states where cannabis is legal, CAC ¶ 64—plainly place DPPs' businesses outside the scope of the federal Sherman Act. *See, e.g., Brinkmeyer*, 2023 WL 1798173, at *13. Because no interstate market for cannabis exists, DPPs cannot plead that the Distributors' alleged conduct harmed or restrained interstate commerce and, therefore, cannot as a matter of law seek redress under the Sherman Act. *Cf. Id*. at *10-11 (holding that plaintiffs had no "federal statutory or constitutional property right to cannabis while it remains federally illegal" and "citizens do not have a legal interest in participating in a federally illegal market"). This is especially so given that DPPs do not—and cannot—allege that their resale of cannabis-filled Vapes went beyond purely intrastate transactions in states that already have legalized the sale and consumption of cannabis in recreational or medicinal form. *See, e.g.,* CAC ¶ 63 (acknowledging "each State's cannabis market is localized to within its borders"), ¶ 64(c) (alleging DPPs only sell to "licensed retail shops" or "directly to

Distributors' Motion to Dismiss
Lead Case No. 3:25-cv-01428-VC

consumers," which by-definition only can occur within states that have legalized the sale and consumption of cannabis). And, because DPPs cannot satisfy the interstate commerce requirement, this Court does not have subject matter jurisdiction over DPPs' Sherman Act claims. *See Ferguson*, 848 F.2d at 979 (interstate commerce is "a prerequisite for federal court jurisdiction" over Sherman Act claims).

### ii. DPPs Cannot Plead Antitrust Injury, and Thus Lack Antitrust Standing under the Sherman Act, Because DPPs Allege They Operate Cannabis Businesses.

DPPs similarly cannot establish the requisite antitrust standing to bring a claim under the Sherman Act. *Arcell v. Google, LLC*, 2023 WL 5336865, *5 (N.D. Cal. Aug. 18, 2023). Although both Article III standing and antitrust standing require a plaintiff to have suffered an injury, antitrust standing is more specific and requires that the injury be caused by the antitrust violation itself. *See id*. Courts in this Circuit consider five factors for antitrust standing: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *E.g.*, *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021). No single factor is dispositive, but one is required: DPPs must demonstrate an antitrust injury, that is, an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. *Id*. at 456. DPPs cannot plead antitrust injury because the harm they allegedly suffered is not recognized under federal law because there is no interstate market for the purchase of cannabis. Indeed, DPPs' only alleged antitrust injury is the allegedly supracompetitive prices they paid "for CCELL-branded Vapes" (which DPPs allege they later filled with cannabis oil) that were allegedly more "than they would have [paid] absent Defendants' anticompetitive conduct." CAC ¶¶ 174, 187; *see id*. ¶¶ 64(c), 116, 149.

Courts in this Circuit and others have long recognized that a plaintiff cannot suffer an antitrust injury where the harm suffered is grounded in unlawful commerce. *See, e.g., Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.* 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004) (no antitrust claim where plaintiff cannot allege lawful injury); *PharmacyChecker.com v. Nat'l Ass'n of Bds. of Pharmacy*, 2023 WL 2973038, at *13 (S.D.N.Y. Mar. 28, 2023) (holding plaintiffs "cannot suffer an antitrust injury if [their] asserted harm is based in illegal conduct"). Because DPPs' only alleged antitrust injury for their federal Sherman Act claim relates to their cannabis purchases and sales—that they do not allege they conduct interstate because federal law prohibits—DPPs do not have the requisite antitrust injury or standing.

**B.    DPPs Fail to State a Claim Under Section 1 of the Sherman Act.**

DPPs cannot meet the requisite elements to sustain their Sherman Act claim. To plead a Section 1 claim, a plaintiff must plausibly allege: "(1) 'a contract, combination or conspiracy among two or more persons or distinct business entities'; (2) which is intended to restrain or harm trade; (3) 'which actually injures competition'; and (4) harm to the plaintiff from anticompetitive conduct." *Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015). But the allegations cannot be mere conclusions and bare supposition; rather, they must "reach the level suggesting [a] conspiracy" to avoid "the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence." *Twombly*, 550 U.S. at 559. DPPs plead nothing more than lawful, vertical agreements with well-recognized procompetitive benefits.

**i.    DPPs Do Not Plausibly Plead a *Per Se* Violation under the Sherman Act Relating to the Alleged Resale Price Maintenance or Customer Allocation.**

DPPs have not pleaded a violation of the antitrust laws, let alone a *per se* violation. In limited circumstances, courts dispense with the standard rule of reason analysis because the restraint falls into a "small group" of antitrust violations, "typically only [certain] horizontal restraints," that are treated as *per se* unlawful. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021). Although horizontal price fixing agreements among competitors may be subject to the *per se* standard, vertical restraints—whether price or non-price—are subject to the rule of reason. *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 868 F. Supp. 2d 876, 890 (N.D. Cal. 2012), *order vacated in part on other grounds on reconsideration*, 2012 WL 1745592 (N.D. Cal. May 16, 2012).

Although DPPs attempt to characterize Smoore's pricing guidelines as resale price maintenance *agreements*, DPPs do nothing more than describe a unilateral pricing policy that Smoore alone set and enforced and therefore do not state even a rule of reason claim. *See, e.g.,* CAC ¶ 80. It is well settled that these types of unilateral pricing policies, and a supplier's enforcement of the same (including by refusing to deal with resellers who do not comply), are lawful under the Sherman Act. *See, e.g., The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1153-54 (9th Cir. 1988).

But even if DPPs did plausibly allege resale price maintenance agreements, the alleged distribution agreements are vertical because they are between parties at different levels of the market structure—*i.e.,* the manufacturer (Smoore) and an independent reseller (each Distributor). The Ninth Circuit has long

recognized that vertical, dual distribution channels do not transform alleged resale price maintenance agreements into *per se* unlawful horizontal restraints and instead are analyze under the rule of resaon. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986) (categorizing dual distributorships as vertical and analyzing them under the rule of reason); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982) ("[I]n the absence of proof of anti-competitive purpose or effect, dual distribution systems must be evaluated under the traditional rule of reason standard.").

Moreover, vertical price restraints like those alleged here are subject to the rule of reason and routinely found lawful and procompetitive. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) ("Even vertical agreements that directly prohibit retail price reductions, eliminating downward competitive pressure on price and thereby resulting in higher consumer prices . . . are not unlawful absent a showing of anticompetitive effect.") (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007)); *see also Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 976 (9th Cir. 2008) ("If the agreement was to set a minimum retail price . . . such a vertical 'resale price maintenance' scheme is not a valid *per se* antitrust violation.").

DPPs' allegations that each Distributor was required to report customer names, prices, and supposed violations of distribution agreements **to Smoore** (but not the other way around) confirms a vertical, not horizontal, relationship. CAC ¶ 92. That verticality is not undone because Smoore occasionally sells to the same type of customers as Distributors. *Dimidowich*, 803 F.2d at 1481.

DPPs' claims of market allocation receive the same treatment under the Sherman Act in the dual distribution context. *Krehl*, 664 F.2d at 1357. Although market allocation may be *per se* unlawful under the Sherman Act in limited circumstances where a horizontal agreement is plausibly pleaded, in the context of dual distribution relationships like the vertical one here, alleged market allocation agreements are subject to the rule of reason. *See Ajir v. Exxon Corp.*, 185 F.3d 865, *3 (9th Cir. 1999) (dual distribution relationships "are treated under the law as vertical relationships"); *Krehl*, 664 F.2d at 1357 (dual distribution system including market allocation is a vertical relationship and receives rule of reason treatment in the absence of proof of anticompetitive purpose or effect).

      ii.    **DPPs Do Not Plausibly Allege an Unlawful Conspiracy Under the Rule of Reason.**

**DPPs Fail to Allege an Unlawful Conspiracy.** DPPs' legal conclusions masquerading as "facts"

Distributors' Motion to Dismiss
Lead Case No. 3:25-cv-01428-VC

do not plead the requisite conspiracy. The "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Name.Space*, 795 F.3d at 1129 (quoting *Twombly*, 550 U.S. at 553). Allegations must raise "a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. "[C]onclusory allegation[s] of [an] agreement at some unidentified point" are not sufficient. *Id.*

*First,* DPPs do not allege ***any*** specifics concerning each individual distribution agreement—instead using sweeping characterizations about all the relationships together and the provisions of "some or all" of the distribution agreements. *See, e.g.,* CAC ¶¶ 6, 83. In this way, DPPs brush over the specifics of each individual distribution agreement in an impermissible shotgun-pleading fashion that does not sufficiently describe the terms of each of the four allegedly unlawful distribution agreements. For example, DPPs do not allege: (i) when each Distributor entered an agreement with Smoore (instead relying on atmospheric allegations about when each Distributor *may* have started selling Smoore's Vapes based on public advertising, *id.* ¶¶ 48, 54, 56, 58); (ii) the specific terms of each agreement, including whether the agreements even contained the same pricing provisions; or (iii) whether the alleged agreements are still in effect. This type of scattershot Sherman Act pleading does not pass muster, as a plaintiff "cannot sustain its burden by offering broad allegations and complaints that are unhinged from any specific agreement." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016); *see also D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) (holding that to support a "plausible inference" of agreement, plaintiff "must plead who, did what, to whom (or with whom), where, and when"). DPPs fail to allege any specifics of the agreements or their terms and, thus, any direct evidence of a conspiracy.

*Second*, DPPs unsuccessfully attempt to allege a broader conspiracy among all Defendants through the naked allegation all Defendants entered an "anticompetitive horizontal agreement . . . no later than December 1, 2016." CAC ¶ 5. Ostensibly, DPPs try to allege the "anticompetitive horizontal agreement" is memorialized in each individual distribution agreement that a Distributor entered with Smoore. But DPPs do not explain how all four Distributors could be parties to an unlawful conspiracy beginning in December 2016 when two Distributors (3Win and Greenlane) allegedly did not even begin selling Smoore's Vapes until months or years later. *Id.* ¶¶ 56, 59. And, in any event, these distribution agreements themselves are not horizontal, as they were entered in the context of Smoore's dual distribution channel

this Circuit has repeatedly held are vertical, not horizontal, agreements. *See supra* Part IV.B.i. DPPs' allegations concerning the ITC patent litigation also do not suggest Distributors were involved in any way in such litigation and thus do not establish a conspiracy. CAC ¶¶ 101-10.

DPPs similarly fail to allege any specifics regarding the supposed market allocation agreements among Defendants, like whether the alleged agreement is contained in the individual distribution agreements, whether there were multiple agreements or one global agreement, which Defendants supposedly entered into which agreements, which customers were allocated and to whom, when the alleged agreements were made, and what instructions employees were supposedly given in alleged trainings. *Stanislaus Food Products Co. v. USS-POSCO Industries*, 782 F. Supp. 2d 1059, 1075 (E.D. Cal. 2011) (dismissing Sherman Act market allocation claims where plaintiff's allegations were "conclusory and non-specific" where "[n]o specifics [were] given. No specific agreements among and between defendants are alleged. All defendants agreed to all agreements, notwithstanding their different corporate roles in and between themselves," and plaintiffs did "not allege where the agreement was made, or if there were multiple agreements or one global agreement made at one time").

*Third*, without plausibly pleaded agreements that would constitute direct evidence, DPPs must instead rely on circumstantial evidence. DPPs cannot just plead parallel conduct but must also allege "certain plus factors [that] elevate allegations of parallel conduct to plausibly suggest the existence of a conspiracy." *In re DRAM Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022). DPPs here do neither. DPPs do not identify ***any parallel pricing*** among the Distributors or Smoore. *See generally* CAC. DPPs repeat again and again some variation of the allegations that the distribution agreements contained provisions "setting minimum wholesale prices" for Smoore's Vapes, CAC ¶ 6, and that "Defendants trained their employees to abide by the agreed-upon minimum wholesale prices," *id.* ¶ 86. But DPPs fail to allege facts concerning the prices that each Distributor and Smoore allegedly charged in the wholesale market for Vapes or that the Distributors were subject to the same alleged pricing guidelines. Without such allegations, this Court is left to guess whether parallel pricing occurred and whether such pricing suggests an unlawful conspiracy. *See In re Musical Instr. And Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 (9th Cir. 2015) (allegations of an increase in the "average retail price" of all goods sold, instead of an increase in the price of goods "manufactured by defendants," is insufficient to plead parallel

conduct); *Flextronics, Int'l USA, Inc. v. Murata Mfg. Co., Ltd*, 2020 WL 5106851, at *2 (N.D. Cal. Aug. 31, 2020) (allegations of "average pricing" instead of the "prices charged by any particular defendant" left the court unable to "evaluate the individual prices at issue"). Nor do DPPs allege plus factors that suggest anything more than independent, rational conduct. Plus factors are "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical*, 798 F.3d at 1194. A "plus factor" must point to "an illegal conspiracy," rather than conduct that "just as easily suggest[s] rational, legal business." *Id.* at 1193.

Rather than alleging parallel conduct and plus factors, DPPs rely only on the existence of a single meeting that allegedly occurred almost 7 years ago between Smoore and the Distributors. CAC ¶¶ 87-91. Yet conclusory allegations about a single meeting between a manufacturer and its distributors that took place well outside the statute of limitations, *id.* ¶¶ 85-91, are ***not*** the same as allegations of parallel conduct and plus factors that "plausibly suggest the existence of a conspiracy." *In re DRAM Antitrust Litig.*, 28 F.4th at 47; *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 439 (E.D. Pa. 2018) ("Although Plaintiffs need not 'plead specific back-room meetings between specific actors at which specific decisions were made' to withstand dismissal on the basis of direct evidence, more is required than non-specific allegations of attendance or participation."); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (dismissing complaint because "Plaintiffs have not pleaded that defendants ever met and agreed to fix prices; they plead at most that defendants had the opportunity to do so because they attended many of the same meetings"). If anything, a meeting between a manufacturer and its distributors is akin to a trade organization or industry event, mere participation in which "does not suggest an illegal agreement." *E.g., In re Musical*, 798 F.3d at 1196. This is because such industry groups "often serve legitimate functions and courts are reluctant to infer conspiracy from" such meetings. *In re DRAM Antitrust Litig.*, 28 F.4th at 52 (cleaned up). But DPPs' allegations do not include any specifics about this in-person meeting beyond: (i) that it allegedly happened, CAC ¶ 88; (ii) certain individuals allegedly participated, *id.* ¶ 89; and (iii) that it occurred in either 2018 or 2019, *id.* ¶ 88. These allegations do not convert a mill-run meeting between a manufacturer and its distributors into evidence that the Distributors and Smoore "reach[ed] or attempt[ed] to reach an[] agreement" or engaged in "concerted action" that violates the antitrust laws. *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S.

563, 586 (1925). Even if DPPs had plausibly pleaded an unlawful agreement based on this one meeting, they fail to allege any other plus factors establishing anything since.

**DPPs Allege An Implausibly Narrow Product Market and an Implausible Geographic Market.** DPPs fail to allege a plausible relevant market that the allegedly anticompetitive conduct affected. *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1106 (N.D. Cal. 2022). To plead a rule of reason claim, DPPs must plausibly "identify the relevant geographic and product markets . . . and allege facts demonstrating that Defendants' conduct ha[d] an anticompetitive effect on those markets[.]" *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104-1105 (9th Cir. 1999).

Here, DPPs limit the alleged relevant product market to a single brand market—the "wholesale sales of [CCELL-brand closed cannabis oil vaporizing systems] in the United States." CAC ¶ 149[2]; *see also id.* at 1 (defining "Vapes" as "***CCELL-branded*** (short for 'Ceramic Cell') closed cannabis oil vaporizer systems and components") (emphasis added); *id.* ¶ 150 ("[t]he relevant product market is the wholesale market for unfilled ***Vapes***") (emphasis added). DPPs, however, "cannot ignore economic reality and arbitrarily choose the product market relevant to its claims; rather, [DPPs] must justify any proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Reilly*, 578 F. Supp. 3d at 1107 (cleaned up). Where an alleged market "does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient[.]" *Siegler v. Sorrento Therapeutics, Inc.*, 2019 WL 3532294, at *15 (S.D. Cal. Aug. 2, 2019); *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").

By alleging such a narrow, single-brand market, DPPs ensure that Smoore and the Distributors account for almost the entire (if not the entire) market they plead because a Defendant owns the brand that defines the outer boundaries of the entire alleged relevant product market. Such single-brand markets are highly disfavored. *See, e.g., Reilly*, 578 F. Supp. 3d at 1107 ("It is an understatement to say that single-brand markets are disfavored" and "a single brand is never a relevant market when the underlying product

---

[2] DPPs appear to also allege that "component parts" of Vapes are a separate relevant market. (CAC ¶¶ 70, 150). However, DPPs do not engage in any further analysis of the "component parts" market beyond stating it, so any alleged components market it improperly pleaded as a matter of law.

is fungible") (internal quotation omitted); *see also Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (single-brand markets "are, at a minimum, extremely rare"). A manufacturer's own product "do[es] not comprise a relevant product market." *Apple, Inc.*, 586 F. Supp. 2d at 1198. But even if DPPs expanded the alleged product market to "wholesale sales of [closed cannabis oil vaporizing systems] in the United States," CAC ¶ 116, without limiting such systems only to Smoore's CCELL-brand system, DPP's alleged market is still too narrow because it ignores reasonably interchangeable products. To support their gerrymandered market definition without addressing reasonable substitutes, DPPs allege that closed cannabis oil vaporizing systems are unique from vaporizing systems designed for use with nicotine products. *Id*. ¶¶ 43-44. This is a false dichotomy because it sets up a cannabis versus nicotine vaporizer analysis, when the law requires DPPs to address the other methods of ingesting cannabis as potential substitutes for Vapes in the market. DPPs exclude from the alleged product market other methods of consuming or ingesting cannabis (whether through inhalation of smoke or vapor, or edible consumption), *id.* ¶¶ 152, 153, and do not explain why these other methods of cannabis ingestion are not reasonably interchangeable. In doing so, DPPs fail to address interchangeable substitute products, which itself is a fatal pleading deficiency. *See Siegler*, 2019 WL 3532294 at \*14.

What's more, DPPs' perfunctory reference to the Hypothetical Monopolist Test is devoid of any facts necessary to state a claim. CAC ¶ 154 (conclusorily stating "no other product would result in a cannabis consumption product with the required characteristics described above"). Such conclusory allegations are insufficient to plead their purported market. *See generally* CAC; *see also Apple, Inc.*, 586 F. Supp. 2d at 1198 (holding that conclusory allegations regarding SSNIP test offered no support for plaintiff's claims). To plead a relevant market under the Hypothetical Monopolist Test, a plaintiff must plead facts showing that the alleged hypothetical monopolist could impose a small but significant nontransitory increase in price ("SSNIP") in the proposed product market and buyers would continue to purchase the product regardless of the increase. *In re German Auto. Manufacturers Antitrust Litig.*, 497 F. Supp. 3d 745, 758-59 (N.D. Cal. 2020) (finding plaintiff failed to adequately allege relevant market through Hypothetical Monopolist Test where plaintiff offered only "bare allegations" and "empirical evidence of no value"). DPPs do not even attempt to meet this burden here.

The alleged geographic market is similarly implausible. To state a claim, an antitrust plaintiff's

plausible relevant market must include "both a geographic and a product market." *Reilly*, 578 F. Supp. 3d at 1106. DPPs allege a nationwide market consisting of all "closed cannabis oil vaporizer systems and components sold … in the United States and its territories." CAC at 1. Although DPPs acknowledge cannabis is only legal either recreationally or medicinally in 39 states, they nevertheless contend "[t]he relevant market for antitrust purposes is the wholesale market for unfilled Vapes in the United States." *Id.* ¶¶ 149, 157. But, as noted above, the geographic market here cannot be nationwide when the alleged harm DPPs suffered was to their cannabis operations that are unlawful in 11 states and under federal law—a fact DPPs admit. *See id.* ¶ 41 (compiling chart of state legalization status).

**DPPs Do Not Plausibly Plead Anticompetitive Effects in the Alleged Market.** Even if DPPs had plausibly pleaded an agreement and defined the relevant market (they did not), they fail to allege facts showing anticompetitive effects within that alleged market. DPPs' allegations concerning Defendants' vertical agreements focus almost entirely on harm to "***intrabrand*** competition"—that is, restrictions on how Smoore's own products are priced or distributed—by "setting a minimum wholesale price for [Smoore's] ***CCELL-branded Vapes***…" thereby "raising, maintaining, and/or stabilizing the wholesale price of ***CCELL-branded Vapes*** at" supracompetitive levels. *See* CAC ¶¶ 182, 186 (emphasis added).

But such allegations, even if true, do not establish a violation of Section 1. The Supreme Court has made clear that the antitrust laws are designed to protect *interbrand*, not intrabrand, competition. *See Leegin*, 551 U.S. at 895 ("[T]he antitrust laws are designed primarily to protect interbrand competition, from which lower prices can later result."). Interbrand competition is "the competition among manufacturers selling different brands of the same type of product." *Id.* at 890. Vertical price restraints such as resale price maintenance agreements often have procompetitive effects because they "stimulate interbrand competition . . . by reducing intrabrand competition." *Id.* Antitrust laws permit this reduction in ***intrabrand*** competition because "the primary purpose of the antitrust laws is to protect [interbrand] competition." *Id*. Limiting intrabrand competition can strengthen interbrand competition by, *inter alia*, encouraging investment in new products and retailer services—such as promotions and product support—that enhance the brand's market appeal.  *See id*. This is why courts regularly conclude that vertical price restraints that restrict only intrabrand competition are lawful. *See, e.g., Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339-40 (11th Cir. 2010) ("Nor does the complaint allege that interbrand competition—

that is, how competitors react to the allegedly higher prices of [products]—has been harmed by marketwide increased prices or reduced output."); *Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1290 (S.D. Fla. 2021) ("As a general matter, reduction in intrabrand competition is not an anticompetitive effect under the Sherman Act.").

Moreover, DPPs do not allege that that prices for non-CCELL-branded vapes (or other devices or means for cannabis ingestion) have risen, that consumers had fewer choices among competing brands, or that any rival has been materially hindered in competing. DPPs' single, conclusory allegation that the challenged agreements "adversely impacted interbrand competition … by, *inter alia*, barring Defendants from selling non-CCELL-branded Vapes," CAC ¶ 183, is unsupported by any factual allegations and thus insufficient under governing pleading standards. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

If DPPs intend to suggest that an exclusive dealing arrangement between the Distributors and Smoore harmed interbrand competition by preventing the Distributors from selling rival vapes, DPPs would need to plead facts sustaining the inference that the agreements foreclose a substantial share of the relevant market. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) ("[A]n exclusive dealing arrangement violates Section 1 only if its effect is to foreclose competition in a substantial share of the line of commerce affected.") (cleaned up). The CAC contains no such allegations. The DPPs do not allege, for example, the percentage of the market allegedly foreclosed, the Distributors' market shares in the broader vape market, or the unavailability of alternative channels through which Smoore's competitors may reach consumers. *Cf. Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*, 516 F. Supp. 2d 270, 295 n.8 (S.D.N.Y. 2007) (no substantial foreclosure pled where plaintiff offered "no facts relating to the named distributors' shares of the consumer market")*; Dickson v. Microsoft Corp.*, 309 F.3d 193, 201, 207–09 (4th Cir. 2002) (dismissing claims despite defendant's alleged 95% market share because plaintiff did not allege share of market foreclosed by exclusive agreements); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *1, 6–7 (N.D. Cal. Apr. 25, 2014) (dismissing claims despite defendant's alleged "dominant" share because plaintiff did not plausibly allege foreclosure). Without such allegations, DPPs' allegations show nothing more than the Distributors prioritizing Smoore's brand over others, precisely the kind of brand-enhancing, vertical conduct that the

Supreme Court has held does not offend the Sherman Act. *See Leegin*, 551 U.S. at 890. In short, the CAC fails to plausibly allege that Defendants' vertical agreements harm interbrand competition in a relevant market, and the claims should be dismissed on that basis.

**C.     DPP Summit Cannot Pursue its California or Sherman Act Claims Because It is in Suspended Tax Status Under California Law and, Therefore, Cannot Sue.**

The Federal Rules of Civil Procedure dictate that the capacity of a corporation to sue or be sued shall be determined "by the law under which it was organized." Fed. R. Civ. P. 17(b). When determining capacity to sue, the law of the state of incorporation "prevails over [federal] antitrust law." *See Community Elec. Serv. of Los Angeles, Inc. v. Nat'l Elec. Contractors Ass'n, Inc.*, 869 F.2d 1235, 1239 (9th Cir. 1989), *abrogated on other grounds*, 914 F.2d 1136 (9th Cir. 1990). In California, the California Franchise Tax Board "may suspend the rights, powers and privileges of a corporation for nonpayment of taxes[,]" and "[a] delinquent California corporation may neither bring suit nor defend a legal action." *Id.* (dismissing Sherman Act claims brought by suspended corporation). Indeed, the Ninth Circuit has repeatedly held that an entity the tax board places in suspended status "ha[s] no capacity to sue." *Id.* (collecting cases).

Here, the California Franchise Tax Board placed DPP Summit in suspended tax status and, as of the time of this motion, DPP Summit remains in suspended status. *See* California Secretary of State Business Search, Business Entity Profile for "Summit Industrial Solutions, LLC," https://bizfileonline.sos.ca.gov/search/business.[3] As a result, DPP Summit has no capacity under California law, and by extension under Fed. R. Civ. P. 17(b), to pursue any of the Sherman Act, Cartwright Act, or California Unfair Competition Law claims set forth in the CAC. This Court should therefore dismiss the Sherman Act claims to the extent brought by DPP Summit, and dismiss the Cartwright Act and California Unfair Competition Law claims ***in their entirety***. Counsel for the Distributors notified Summit's counsel of this issue on May 9, 2025, yet Summit remains in suspended status.

**D.     DPP Summit's California Claims Fail as a Matter of Law.**

**DPP Summit Does Not Plausibly Plead a Violation of the Cartwright Act.** Because the Cartwright Act "mirrors the analysis under federal law," *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001), dismissal of DPPs' Sherman-Act Section 1 claim likewise requires

---

[3] Courts may take judicial notice of business entity profiles on secretary of state websites, as such profiles are "matters of public record and not subject to reasonable dispute." *Applied Underwriters, Inc. v. Lara*, 530 F. Supp. 3d 914, 924 (E.D. Cal. 2021).

dismissal of their parallel Cartwright Act claim. *See Hip Hop Beverage Corp. v. Monster Energy Co.*, 2016 WL 7479402, at *4, n.6 (C.D. Cal. July 7, 2016) (holding that "when a plaintiff's Sherman Act claims are dismissed for failure to state a claim, plaintiff's Cartwright Act claims should also dismissed").  Summit fails to state a claim—*per se* or otherwise—under the Cartwright Act for the same reasons DPPs fail to state a claim under the Sherman Act. Summit does not adequately allege a *per se* unlawful horizontal agreement between Defendants.  *See supra* Part IV.B.i.

Nor can Summit capitalize on any differences in the way California and federal law treat vertical price restraints to make out a *per se* violation of the Cartwright Act. Summit does nothing more than describe a unilateral pricing policy that Smoore alone set and enforced, *see supra* Part IV.B.i, and such unilateral policies are equally permissible under the Cartwright Act. *See Beverage v. Apple, Inc.*, 101 Cal. App. 5th 736, 750 (2024) ("'California courts have adopted the *Colgate* doctrine for purposes of applying the Cartwright Act.'"); *Alan Darush MD APC v. Revision LP*, 2013 WL 1749539, at *4 (C.D. Cal. April 10, 2013) ("'[i]f a seller does no more than announce a policy designed to restrain trade, and declines to sell to those who fail to adhere to the policy, no illegal combination is established[.]'")

Even if that were not so, any *per se* claim would flounder due to Summit's failure to plausibly allege antitrust injury. *See Greencycle Paint, Inc. v. Paintcare, Inc.*, 2016 WL 1402845, at *6 (N.D. Cal. Apr. 8, 2016) (antitrust injury requirement applies to all Cartwright Act claims, whether *per se* or rule of reason); *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 548 (Cal. 1998) ("An antitrust injury must be proved, that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders the defendants' acts unlawful."). To plead antitrust injury "where an antitrust plaintiff alleges vertical restraints, facts must be pled showing 'some anticompetitive effect in the larger, **interbrand** market'." *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 495 (2011) (emphasis added). As detailed above, there are no allegations of "negative impacts on overall [vape] prices" or other facts that would suggest Defendants' intrabrand pricing practices harmed interbrand competition. *See id.*; *supra* Part IV.B.ii. The Cartwright Act, in other words, offers Summit no refuge where the Sherman Act does not, and its state antitrust claims should be dismissed.

**DPP Summit Does Not Plausibly Plead a Violation of the California Unfair Competition Law ("UCL").** To state a UCL claim, a plaintiff must identify a "specific practice" defendant undertook that

Distributors' Motion to Dismiss
Lead Case No. 3:25-cv-01428-VC

was "unfair" or "deceptive." *See Castaneda v. Saxon Mortg. Servs., Inc.*, 687 F. Supp. 2d 1191, 1202 (E.D. Cal. 2009). Summit does not plead a "specific practice" sufficient to support its claim. Instead, Summit pleads in a conclusory fashion that "Defendants' conduct constitutes 'unfair' business acts" and "the conduct alleged in this Complaint is [] unlawful." CAC ¶¶ 206, 212. But Summit does nothing to specify what conduct across the more than 200-paragraph CAC constitutes the alleged "unfair" or "unlawful" practice. *See generally* CAC. Nor can the alleged antitrust violations serve as a predicate for Summit's UCL claim, as DPPs' antitrust claims fail. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 186–87 (1999) (construing "unfair" in UCL as "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to [] a violation of the law, or otherwise significantly threatens or harms competition.").

**E.     DPPs' Sherman Act and California Claims Are Barred by the Statute of Limitations.**

All DPPs' claims are barred because they are subject to a four-year statute of limitations. 15 U.S.C. § 15b (Sherman Act); Cal. Bus. & Prof. Code §§ 16750.1 (Cartwright Act); Cal. Bus. & Prof. Code § 17208 (UCL). "[A] claim may be dismissed as untimely when the running of the statute [of limitations] is apparent from the face of the complaint." *Kowarsh v. Heckman*, 2015 WL 2406785, at *9 (N.D. Cal. May 19, 2015). In antitrust cases, claims accrue when a plaintiff is injured. *Zenith Radio Cop. v. Hazeltine Res.*, 401 U.S. 321, 337-38 (1971) (claims "accrue[] when a defendant commits an act that injures a plaintiff's business"); *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1208 (N.D. Cal. 2015) (dismissing federal and state antitrust claims when injury was more than four years before filing).

Each DPP alleges it purchased Vapes at supracompetitive prices "at least as early as December 1, 2016." *See* CAC ¶¶ 19-21 (alleging purchases during the "Class Period"); *id.* ¶ 31 (defining "Class Period" as beginning "at least as early as December 1, 2016"). But DPPs each filed their initial complaints against Smoore and the Distributors on February 11, 2025 (Earth's Healing), April 10, 2025 (Redbud Roots), and April 17, 2025 (Summit). *See* ECF 61 at 2-3. Because DPPs' claims accrued on the date each DPP or putative class member was supposedly injured—2016—DPPs' claims expired on December 1, 2020.

DPPs unsuccessfully attempt to avoid this reality through conclusory allegations invoking fraudulent concealment and the continuing violations doctrine. As to fraudulent concealment, DPPs contend Smoore and the Distributors "fraudulently concealed their scheme" through Smoore's public

statement that its pricing guidelines are "recommended" and that Smoore "provide[s] guidance regarding price range," but that the Distributors "should follow [Smoore's] guidance and formulate the final selling price based on their operational performance." CAC ¶ 141. DPPs, however, do not plead the alleged concealment with sufficient particularity to meet Fed. R. Civ. P. 9(b)'s heightened pleading standard. *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1073 (N.D. Cal. 2016). Further, although DPPs contend Smoore's statement was "false and materially misleading," CAC  ¶ 142, this is the only allegation regarding concealment, and it relates to an alleged statement by Smoore, not the Distributors. *Id.* ¶ 141. For the Distributors, this is not "'specific enough to give [the Distributors] notice of the particular misconduct [] alleged . . . so they can defend against the charge.'" *Garrison*, 159 F. Supp. 3d at 1075.

Nor do DPPs even meet the threshold requirements for pleading fraudulent concealment against the Distributors, as DPPs do not allege facts that plausibly suggest the Distributors took affirmative acts to mislead DPPs or that the DPPs took even the most basic steps to diligently attempt to uncover the facts that underlie their asserted claims. *See id.* at 1073. Alleging broadly and in a conclusory fashion that all "Defendants communicated secretly, including by email," CAC ¶ 141, (when all emails are by definition non-public) is insufficient to plead fraudulent concealment. Further, such allegations are undermined by the CAC's inclusion of numerous social-media photos of Defendants' 2018 meeting, which show that Defendants were *not* hiding but *publicizing* the meeting on which DPPs so heavily rely. *Id.* ¶ 91.

Finally, DPPs do not plausibly plead a continuing violation. To do so, "a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: "1) [i]t must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014). DPPs plead neither. In fact, DPPs do not plead a single fact in support of their legal argument that they are "entitled to at least four years of damages from the filing" of this case. CAC ¶ 145. As such, their claims are time barred. *In re Animation Workers*, 87 F. Supp. 3d at 1212 (no continuing violation absent "wrongful communications or specific conduct during the limitations period").

## VI.    **CONCLUSION**

For the foregoing reasons, Distributors respectfully request this this Court dismiss all claims set forth in DPPs' Consolidated Class Action Complaint, with prejudice and without leave to replead.

/s/ Jaikaran Singh
Jaikaran Singh
FOLEY & LARDNER LLP
11988 El Camino Real, Suite 400
San Diego, CA 92130
858-847-6700
Email: jsingh@foley.com

/s/ Diane R. Hazel
Diane Hazel (admitted PHV)
FOLEY & LARDNER LLP
1144 15th Street
Suite 2200
Denver, CO 80202
720-437-2034
Email: dhazel@foley.com

*Attorneys for Defendants Jupiter Research, LLC; 3Win Corp.; Greenlane Holdings, Inc.; and CB Solutions, LLC*

PROOF OF SERVICE

I am employed in the **County of Denver**, **State of Colorado**.  I am over the age of 18 and not a party to this action; my current business address is 1144 15th Street, Denver, Colorado 80202.

On June 27, 2025, I served the foregoing document(s) described as: **DISTRIBUTORS' MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** on the interested parties in this action as follows:

| | |
|---|---|
| LEEDS BROWN LAW, P.C.<br>Jeffrey K. Brown (PHV forthcoming)<br>Blake Hunter Yagman (PHV Admitted)<br>One Old Country Road, Suite 347<br>Carle Place, NY 11514<br>jbrown@leedsbrownlaw.com<br>byagman@leedsbrownlaw.com<br>***Counsel for Plaintiffs*** | SULTZER & LIPARI, PLLC<br>Jason R. Sultzer (PHV forthcoming)<br>Scott E. Silberfein (PHV admitted)<br>85 Civic Center Plaza, Ste. 200<br>Poughkeepsie, NY 12064<br>sultzerj@thesultzerlawgroup.com<br>silberfeins@thesltzerlawgroup.com<br>***Counsel for Plaintiffs*** |
| QUINN EMANUEL URQUHART AND SULLIVAN LLP<br>Kevin Yoshiwo Teruya<br>William R. Sears<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>kevinteruya@quinnemanuel.com<br>willsears@quinnemanuel.com<br>***Counsel for Smoore Defendants*** | THE FERRARO LAW FIRM, P.A.<br>James L. Ferraro (PHV forthcoming)<br>James L. Ferraro, Jr. (PHV forthcoming)<br>600 Brickell Avenue, Ste. 3800<br>Miami, FL 33131<br>jferraro@ferrarolaw.com<br>james@ferrarolaw.com<br>***Counsel for Plaintiffs*** |

  X     BY ELECTRONIC COURT FILING SERVICE (E-SERVICE)
        I personally caused each document listed above to be served by Court-approved Electronic Court Filing Service Provider by transmitting true and correct copies of each document for electronic service to the addressees above at the e-mail addresses listed therein.

  X     Executed on June 27, 2025, at Denver, Colorado.

  X     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

                *s/Diane R. Hazel*
                Diane R. Hazel

Distributors' Motion to Dismiss
Case No. 3:25-cv-01428-VC