QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kevin Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
William Sears (Bar No. 330888)
willsears@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Shenzhen Smoore Technology Company, Limited*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| EARTH'S HEALING, INC.; REDBUD ROOTS INC., and SUMMIT INDUSTRIAL SOLUTIONS LLC <br><br> Plaintiffs, <br><br> vs. <br><br> SHENZHEN SMOORE TECHNOLOGY CO. LTD.; JUPITER RESEARCH LLC; GREENLANE HOLDINGS, INC.; 3WIN CORP.; and CB SOLUTIONS, LLC d/b/a CANNA BRAND SOLUTIONS, <br><br> Defendants. | **Lead Case No. 25-cv-1428-VC** <br> **Case No. 25-cv-3221- VC** <br> **Case No. 25-cv-3431- VC** <br><br> **SMOORE'S MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)** <br><br> The Hon. Vince Chhabria <br><br> Trial Date: None Set <br><br> Date:  August 14, 2025 <br> Time: 10:00 AM |

Case No. 25-CV-1428-VC

SMOORE'S MOTION TO DISMISS DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

**NOTICE OF MOTION**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 14, 2025, at 10:00 am, or as soon thereafter as the matter may be heard, in Courtroom 4 at the United States District Court, 450 Golden Gate Avenue, San Francisco, California 94102, 17th Floor, before the Honorable Judge Vince Chhabria, Defendant Shenzhen Smoore Technology Co., Ltd. will and hereby does move under Rule 12(b)(6) of the Federal Rules of Civil Procedure for an order dismissing with prejudice the Consolidated Class Action Complaint filed by Direct Purchaser Plaintiffs Earth's Healing, Inc., Redbud Roots Inc., and Summit Industrial Solutions LLC ("DPPs") (Dkt. 63).

Defendant respectfully requests an order dismissing with prejudice all causes of action brought against it in the above-captioned matter. The grounds for this Motion are: (1) DPPs do not plausibly allege a *per se* federal antitrust claim; (2) DPPs' claim also fail under the rule of reason; (3) DPPs do not plausibly allege a Cartwright Act claim; (4) DPPs lack standing to bring their antitrust claims; (5) DPPs' UCL claim fails; and (6) DPPs' claims are barred by the statute of limitations.

Defendant respectfully requests an order dismissing with prejudice all causes of action brought against it in the above-captioned matter. This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the pleadings, attachments, and records on file in this action, and such other written or oral argument as may be presented at or before the time this Motion is heard by the Court.

DATED: June 27, 2025

/s/ Kevin Teruya
Kevin Teruya
William Sears
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
*Attorneys for Shenzhen Smoore Technology
Company, Limited*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................................1

II.   BACKGROUND ...................................................................................................................3

III.  ISSUES TO BE DECIDED ...................................................................................................4

IV.   LEGAL STANDARD............................................................................................................4

V.    ARGUMENT .........................................................................................................................5

    A.    DPPS DO NOT PLAUSIBLY ALLEGE A *PER SE* FEDERAL ANTITRUST CLAIM.....................................................................................................................5

    B.    DPPS' CLAIMS ALSO FAIL UNDER THE RULE OF REASON .................................6

        1.    The Alleged Anticompetitive Scheme Is Fundamentally Implausible ...................6

        2.    DPPs Fail to Plead a Plausible Contract, Combination, or Conspiracy..................6

        3.    DPPs Fail to Plead Harm to Competition ...............................................................9

    C.    SUMMIT DOES NOT PLAUSIBLY ALLEGE A CARTWRIGHT ACT CLAIM.........11

    D.    DPPS LACK STANDING TO BRING THEIR ANTITRUST CLAIMS.........................13

        1.    DPPs Lack Standing Because Cannabis Trade Is Illegal Under Federal Law .......................................................................................................................13

        2.    Summit Lacks Standing Because It Lacks a Valid Business License ...................13

    E.    SUMMIT'S UCL CLAIM FAILS.....................................................................................14

    F.    DPPS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ...................14

VI.   CONCLUSION.....................................................................................................................15

Case No. 25-CV-1428-VC

SMOORE'S MOTION TO DISMISS DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ahern v. Apple Inc.*,
411 F. Supp. 3d 541 (N.D. Cal. 2019) ...............................................................15

*Ajir v. Exxon Corp.*,
1995 WL 429234 (N.D. Cal. July 7, 1995), *aff'd*, 185 F.3d 865 (9th Cir. 1999) ......................5

*Alan Darush MD APC v. Revision LP*,
2013 WL 1749539 (C.D. Cal. Apr. 10, 2013) ...........................................12

*Alaska Airlines Inc. v. Carey*,
395 F. App'x 476 (9th Cir. 2010) ......................................................13

*In re Animation Workers Antitrust Litig.*,
87 F. Supp. 3d 1195 (N.D. Cal. 2015) ...........................................14, 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................4

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)..............................................................8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................4, 6, 7

*Beverage v. Apple, Inc.*,
101 Cal. App. 5th 736 (Cal. App. 2024)................................................12

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .......................................................6, 9, 10

*Brinkmeyer v. Washington State Liquor and Cannabis Bd.*,
2023 WL 1798173 (W.D. Wash. Feb. 7, 2023)..........................................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)....................................................................13

*Cal. Computer Prods., Inc. v. Int'l Bus. Machines Corp.*,
613 F.2d 727 (9th Cir. 1979) ............................................................11

*California Crane Sch., Inc. v. Google LLC*,
722 F. Supp. 3d 1026 (N.D. Cal. 2024) ...............................................7, 8

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (Cal. App. 2001)...............................................12, 14

SMOORE'S MOTION TO DISMISS DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

*Christian & Porter Aluminum Co.*,
584 F.2d 326 (9th Cir. 1978) ...........................................................................................14

*City of San Jose v. Off. of the Comm'r of Baseball*,
776 F.3d 686 (9th Cir. 2015) ............................................................................................14

*Cont'l T. V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1997)...............................................................................................................5

*Crowder v. LinkedIn Corp.*,
2023 WL 2405335 (N.D. Cal. Mar. 8, 2023)....................................................................14

*Ctrl Alt Destroy v. Elliott*,
2025 WL 790963 (S.D. Cal. Mar. 12, 2025) .....................................................................13

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022) .................................................................................................6

*E & E Co. v. Kam Hing Enters., Inc.*,
2008 WL 3916256 (N.D. Cal. Aug. 25, 2008) .................................................................11

*Garrison v. Oracle Corp.*,
159 F. Supp. 3d 1044 (N.D. Cal. 2016) ............................................................................15

*Glacier Optical, Inc. v. Optique du Monde*,
46 F.3d 1141 (9th Cir. 1995) ..............................................................................................5

*Glob. Servs. v. Ikon Off. Sols.*,
2011 WL 6182425 (N.D. Cal. Dec. 13, 2011)...................................................................15

*Gonzales v. Raich*,
545 U.S. 1 (2005)...............................................................................................................13

*Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*,
723 F.3d 1019 (9th Cir. 2013) .............................................................................................9

*Greencycle Paint, Inc. v. Paintcare, Inc.*,
2016 WL 1402845 (N.D. Cal. Apr. 8, 2016) ....................................................................12

*Hernandez v. Select Portfolio, Inc.*,
2015 WL 3914741 (C.D. Cal. June 25, 2015) ....................................................................8

*Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*,
863 F.3d 1178 (9th Cir. 2017) ...........................................................................................11

*Intel Corp. v. Fortress Inv. Grp. LLC*,
511 F. Supp. 3d 1006 (N.D. Cal. 2021) ..............................................................................9

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) .........................................................................................6, 7

*Kottle v. Nw. Kidney Ctrs.*,
  146 F.3d 1056 (9th Cir. 1998) ...................................................................................11

*Krehl v. Baskin-Robbins Ice Cream Co.*,
  664 F.2d 1348 (9th Cir. 1982) ..................................................................................5, 9

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) .....................7, 12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007).................................................................................................5, 10

*McDonough v. Toys R Us, Inc.*,
  638 F. Supp. 2d 461(E.D. Pa. 2009) ..........................................................................10

*Microsoft Corp. v. Computer Support Servs. of Carolina*,
  123 F. Supp. 2d 945 (W.D.N.C. 2000) .......................................................................13

*Modesto Irrigation Dist. v. PG&E*,
  309 F. Supp. 2d 1156 (N.D. Cal. 2004), *aff'd*, 158 F. App'x 807 (9th Cir. 2005) .................13

*Pistacchio v. Apple Inc.*,
  2021 WL 949422 (N.D. Cal. Mar. 11, 2021)..............................................................9

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993).....................................................................................................11

*Reilly v. Apple Inc.*,
  578 F. Supp. 3d 1098 (N.D. Cal. 2022) ......................................................................14

*Ryan v. Microsoft Corp.*,
  2015 WL 1738352 (N.D. Cal. Apr. 10, 2015) ...........................................................14

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006).......................................................................................................13

*UCP Int'l Co. v. Balsam Brands Inc.*,
  420 F. Supp. 3d 966 (N.D. Cal. 2019) ........................................................................11

*United Mag. Co. v. Murdoch Mags. Distrib., Inc.*,
  146 F. Supp. 2d 385 (S.D.N.Y. 2001).........................................................................6

*United States v. eBay, Inc.*,
  968 F. Supp. 2d 1030 (N.D. Cal. 2013) ......................................................................13

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978)....................................................................................................8

*Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.*,
  375 F.3d 1341 (Fed. Cir. 2004), *rev'd in part on other grounds*, 546 U.S. 394 (2006)..........10

SMOORE'S MOTION TO DISMISS DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

*Universal Grading Serv. v. eBay, Inc.*,
    2012 WL 70644 (N.D. Cal. Jan. 9, 2012), *aff'd*, 563 F. App'x 571 (9th Cir. 2014) ................6

*Weiss v. Rocket Mortg., LLC*,
    2025 WL 1674371 (C.D. Cal. May 28, 2025) .........................................................................14

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ...............................................................................................11

**<u>Statutes</u>**

21 U.S.C. § 812..................................................................................................................................13

21 U.S.C. § 841..................................................................................................................................13

21 U.S.C. § 844..................................................................................................................................13

Cal. Bus. & Prof. Code § 16720 .......................................................................................................12

## I.    **INTRODUCTION**

Direct Purchaser Plaintiffs ("DPPs'")—Earth's Healing, Inc. ("Earth's Healing"), Redbud Roots Inc. ("Redbud"), and Summit Industrial Solutions LLC ("Summit")—are retailers of cannabis products who bring conclusory and baseless antitrust claims largely copied from a prior lawsuit brought by a proposed class of indirect purchasers. DPPs' Consolidated Class Action Complaint (Dkt. 63) ("CAC") advances the vague theory that Defendants—Shenzhen Smoore Technology Co., Ltd. ("Smoore"), a manufacturer of CCELL components for cannabis vaporizers ("vapes") and four of its authorized distributors, Jupiter Research, LLC ("Jupiter"), 3Win Corp. ("3Win"), CB Solutions, LLC ("CB"), and Greenlane Holdings, Inc. ("Greenlane") (formerly KushCo) (collectively, "Distributors")—conspired to fix prices for Smoore's vape components. DPPs fail to plausibly allege an antitrust claim for multiple reasons.[1]

***DPPs' Claims Are Implausible***. DPPs allege that Smoore entered into agreements with the Distributors to distribute its products—something that is common and procompetitive in many industries because it facilitates the sale of the manufacturer's products. But, DPPs claim, this amounted to "price fixing" because some of the agreements contained price "guidelines." DPPs then allege that because Smoore also directly sold vapes and vape parts to retailers, it competed with the Distributors, rendering the agreements a horizontal price-fixing conspiracy subject to *per se* liability, the harshest form of antitrust liability. This theory fails under federal law. Binding precedent holds that such dual distribution agreements are ***vertical*** agreements which are ***not*** *per se* illegal because they often benefit consumers by facilitating distribution and promoting interbrand competition between different manufacturers.

DPPs must therefore plausibly satisfy the more stringent rule-of-reason standard for their federal law claims, but the CAC falls far short of doing so. To begin with, the CAC's theory that Smoore conspired with its Distributors to raise prices for its own products is fundamentally implausible. Smoore directly sells its products to retailers in the United States. DPPs never explain why Smoore would need to collude with third parties to raise prices for its products when it could just do that in its own direct sales to retailers or in its initial sales to Distributors. This glaring deficiency leaves DPPs unable to plead basic elements of their claim. Moreover, DPPs provide nothing beyond bare legal conclusions on necessary elements of their

---

[1]    Smoore understands that the Distributors also move to dismiss for failure to allege a relevant market, and notes that any dismissal on those grounds would apply to Smoore as well.

SMOORE'S MOTION TO DISMISS DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

claims, including the specifics of the alleged agreements and how they purportedly harmed competition. Far from describing an illegal conspiracy, the CAC merely provides vague assertions about distribution agreements that are fully consistent with lawful and procompetitive justifications, like promoting competition between Smoore and other brands of vapes and encouraging marketing efforts by Distributors.

The few allegations the CAC provides undermine any inference of a conspiracy. While affixing the label "price fixing" to Smoore's distribution agreements, the CAC later says they merely contain "***price guidelines***" and fails to plead that these "guidelines" were even enforced. Thus, even taking DPPs' allegations as true, there was no conspiracy to set prices; rather, Smoore ***unilaterally*** suggested prices to Distributors. That is not unlawful. Further defeating their claims of a conspiracy to raise prices, the CAC explains away any alleged price increases by alleging that Smoore's vapes are popular and high quality, which caused demand (and thus prices) to rise. In a ploy to strengthen these deficient allegations, the CAC includes photos of a benign business meeting, but neglects to mention they were pulled off public social media posts, contradicting any suggestion they depict a secret, unlawful agreement. None of the CAC's other allegations, including its irrelevant references to patent litigation involving Smoore, salvage its claims.

***Summit Fails to State a Cartwright Act Claim***. Tacitly acknowledging that they cannot state a federal claim, DPPs' CAC adds a *per se* claim under California's Cartwright Act. But, this claim fails too, because it is brought only by named Plaintiff Summit, an entity with suspended tax status that is therefore barred from bringing suit. And even if Summit had standing, the CAC fails to allege the type of "coercive" agreement that the Cartwright Act requires for *per se* liability. Again, all the CAC alleges is that Smoore suggested prices to the Distributors. Labeling that benign and commonplace practice "price fixing" does not make it so. And to the extent DPPs plead a rule-of-reason claim under the Cartwright Act, that claim fails for the same reasons as their federal claim.

These overarching failures alone warrant dismissal, but other problems with the CAC abound:

***DPPs Lack Standing***. DPPs lack federal standing because their alleged injuries are premised on their own dealings in a federally illegal market. Independently, Summit lacks standing because it has no valid California business license, dooming DPPs' state claims, which are brought by Summit only.

***Summit's UCL Claim Fails***. As the California Business and Professional Code Section 17200 ("UCL") claim rests on the same allegations, it is coextensive and fails along with DPPs' antitrust claims.

***DPPs' Claims Are Time-Barred***. Finally, DPPs' claims are time-barred by the applicable four-year statute of limitations, because DPPs allege that the conspiracy began more than four years ago, and cite public evidence that predates the conspiracy in support of their claim.

## II.      BACKGROUND

DPPs are three companies which allegedly purchased Smoore's CCELL-branded vape components "directly from one or more Defendants." CAC ¶¶ 19–21. Like the indirect purchaser case it is copied from, the CAC's allegations about the purported anticompetitive conspiracy are skeletal. According to DPPs, the alleged scheme began with an important breakthrough for the cannabis industry: Jupiter, one of the Distributors, developed a vape that could for the first time aerosolize viscous, unstable cannabis oils without producing an unpleasant taste. *Id.* ¶¶ 44–45. The so-called CCELL vape was a breakthrough technology that Jupiter held out as its own and acquired a patent for. *Id.* ¶¶ 46–48. Jupiter hired Smoore to manufacture CCELL vapes. *Id.* ¶ 45. Around November 2016, 3Win became another authorized distributor. *Id.* ¶ 54. CB Solutions and KushCo were added as authorized distributors in 2017 and 2018 respectively. *Id.* ¶¶ 56–59.

The CAC does not specify when the alleged anticompetitive agreements were forged and between which parties. Instead, it asserts that the "existing parties"—presumably Jupiter, Smoore, and 3Win—conditioned the ability of newer members—presumably CB Solutions and KushCo—to become authorized distributors on their (a) signing distribution agreements, "some" of which contained "a wholesale price floor" or "price guidelines" with respect to CCELL vapes; and (b) agreeing not to compete for "some or all" of each of their CCELL vape customers. *Id.* ¶¶ 80–82. Beyond this general outline, DPPs provide few specifics about the agreements. The CAC does not specify, for example, whether Smoore has ever enforced the price guidelines, or the agreement not to compete was memorialized in writing.

DPPs allege that Defendants "trained" employees to abide by minimum prices and not to compete for other Defendants' customers, but do not detail the instructions employees were given. *Id.* ¶¶ 85–86. Further, only "some of" the agreements required Distributors to monthly report customer lists, while only "some of" the agreements included security deposit provisions. *Id.* ¶¶ 93; 95. DPPs allege that these two provisions allow Defendants to enforce the agreements, but stop short of saying that Smoore ever did so. *Id.* ¶¶ 92–96. DPPs also allege that customers seeking to switch distributors were required to request permission from Smoore to do so, but likewise do not say whether this was ever actually enforced. *Id.* ¶ 83.

DPPs state cursorily that these arrangements caused "anticompetitive effects" such as "increased prices and reduced output" but do not detail how *they* suffered injury from these arrangements—for example, by explaining how much prices increased by, or what "output" was "reduced." *See id.* ¶¶ 97–99.

The primary new factual allegation in the CAC is a few pictures of photos of Smoore representatives meeting with representatives of some of the Distributors, *id.* ¶¶ 7; 89–91, which the DPPs assert, without explanation, evidences "price fixing." But the CAC omits that the pictures are publicly available on Instagram. Even taking the photos out of context, as the CAC does, they are entirely innocuous and consistent with corporate marketing and branding efforts.

Finally, DPPs include ten paragraphs of allegations about irrelevant patent suits between Smoore and non-parties. *Id.* ¶¶ 101–10. These allegations appear to have been included largely in an unsuccessful effort to make Smoore sound vaguely nefarious. The CAC does not explain how these relate to its price-fixing allegations, or even reference them in its causes of action, rendering them irrelevant at best.

## III.    ISSUES TO BE DECIDED

1.  Is DPPs' theory that *per se* liability applies to a dual distributor agreement under Sherman Act Section 1 foreclosed by federal law?

2.  Do DPPs fail to state a plausible Sherman Act Section 1 claim under the rule of reason?

3.  Do DPPs' allegations of "price guidelines" fail to state a plausible *per se* Cartwright Act claim?

4.  Do DPPs lack standing to bring their antitrust claims?

5.  Do DPPs fail to state a claim under the UCL?

6.  Are DPPs' claims barred by the four-year statute of limitations?

## IV.    LEGAL STANDARD

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To satisfy the standard, plaintiffs must plead facts showing that their "right to relief [rises] above the speculative level." *Twombly*, 550 U.S. at 555. While the Court must accept factual allegations as true, pleadings that are "no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "[N]aked assertion[s]" devoid of "further factual enhancement" are insufficient, *Twombly*, 550 U.S. at 570. So are "formulaic recitation[s]" of the elements of causes of action. *Id.* at 555.

## V.   ARGUMENT

### A.   DPPS DO NOT PLAUSIBLY ALLEGE A *PER SE* FEDERAL ANTITRUST CLAIM

Smoore sells vapes and vape hardware directly to purchasers as well as through authorized distributors, making it a dual distributor. CAC ¶¶ 3; 67. DPPs' *per se* theory under the federal Sherman Act thus fails, because the Ninth Circuit has explicitly declined to extend *per se* liability to such dual distribution arrangements. *See Krehl v. Baskin-Robbins Ice Cream Co*., 664 F.2d 1348, 1356–57 (9th Cir. 1982).

*Krehl* controls the analysis under federal law. There, the Ninth Circuit held that "in the absence of proof of anti-competitive purpose or effect, dual distribution systems must be evaluated under the traditional rule of reason standard." *Id*. at 1357. This is because dual distributors like Smoore often set minimum retail prices for procompetitive reasons, such as to stimulate the provision of point-of-sale services by distributors, discourage freeriding by other distributors, and ensure quality control. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889–91 (2007); *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55 n.23 (1997) (vertical restraints may be motivated by legal "demands that manufacturers assume direct responsibility for the safety and quality of their products"). As *Krehl* concluded: "Competition is promoted when manufacturers are given wide latitude in establishing their method of distribution and in choosing particular distributors. Judicial deference to the manufacturer's business judgment is grounded in large part on the assumption that the manufacturer's interest in minimum distribution costs will benefit the consumer." *Krehl*, 664 F.2d at 1356–57 (citations omitted). Thus, formalistically invalidating a manufacturer's distribution arrangements, as DPPs urge, could "actually retard competition." *Id.* at 1356.

Following *Krehl*, Ninth Circuit courts have universally declined to impose *per se* liability on dual distribution agreements. *See, e.g.*, *Glacier Optical, Inc. v. Optique du Monde*, 46 F.3d 1141 (9th Cir. 1995) (declining to impose *per se* liability on arrangement between dual distributor of optical frames and its distributor). To the contrary, courts treat such agreements as **vertical** agreements, which the stricter rule-of-reason standard governs. *See, e.g., id.* (rejecting argument that distribution agreement was a "horizontal restraint of trade"); *Ajir v. Exxon Corp*., 1995 WL 429234, at *2 (N.D. Cal. July 7, 1995) ("when the source of a conspiracy between a manufacturer and its distributors is the manufacturer, the agreement is vertical") (dismissing claim under Cartwright Act that dual distribution system was *per se* illegal), *aff'd*, 185 F.3d 865 (9th Cir. 1999). DPPs' *per se* Sherman Act claim should be dismissed for that reason alone.

**B.   DPPS' CLAIMS ALSO FAIL UNDER THE RULE OF REASON**

Under the rule-of-reason standard, DPPs must "plead facts which, if true, will prove '(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition.'" *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). The CAC's threadbare allegations are insufficient to plead the first and third elements: a plausible anticompetitive scheme or harm to competition.

**1.   The Alleged Anticompetitive Scheme Is Fundamentally Implausible**

"[W]here the facts alleged in a complaint demonstrate that an alleged . . . conspiracy makes no economic sense, the cause of action must be dismissed." *See United Mag. Co. v. Murdoch Mags. Distrib., Inc.*, 146 F. Supp. 2d 385, 401–02 (S.D.N.Y. 2001) (dismissing Section 1 claim where alleged scheme was "unnecessary" in order to charge supracompetitive prices or put plaintiffs out of business and therefore made no "economic sense"). That is the case here. DPPs' claim that Smoore conspired with Distributors to raise prices for its products ignores the fact that Smoore can—and does—sell its products directly to retailers at whatever price it wants and can "skip[ ]" a distributor entirely. CAC ¶¶ 3; 67. It makes no "economic sense" for Smoore to *conspire* to raise prices, when it can accomplish the same end alone. *Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *5 (N.D. Cal. Jan. 9, 2012) (dismissing Section 1 claim where "even assuming the convoluted arrangement depicted in the CAC could result in increased commissions to eBay, it would be far easier and more efficient for eBay to simply raise its fees for the sale of coins than to conspire with unrelated non-profit trade groups to develop a policy that *might* result in higher commissions"), *aff'd*, 563 F. App'x 571 (9th Cir. 2014).

**2.   DPPs Fail to Plead a Plausible Contract, Combination, or Conspiracy**

Even assuming the alleged conspiracy made sense, "plaintiffs must allege something more than conduct merely consistent with agreement in order to 'nudge[ ] their claims across the line from conceivable to plausible.'" *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022) (citing *Twombly*, 550 U.S. at 570); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (plaintiffs must allege "who, did what, to whom (or with whom), where, and when"). But DPPs do not attach the alleged agreements or otherwise provide direct evidence of their terms.

This means that the Court must look to "circumstantial evidence plausibly suggesting the existence of the purported conspiracy." *California Crane Sch., Inc. v. Google LLC*, 722 F. Supp. 3d 1026, 1038 (N.D. Cal. 2024). DPPs' conclusory statements that Defendants entered ill-defined agreements with pricing provisions that may or may not have included covenants not to compete for "some or all" of each other's customers do not suffice. *See id.* (bare statements that "written agreements were formed, confirmed, reconfirmed, and negotiated from time to time in private, secret, and clandestine personal meetings" held insufficient).

None of DPPs' other allegations about the agreements renders their claim any more plausible.

***Price-Fixing Allegations.*** The CAC says Defendants entered "price-fixing" agreements, CAC ¶ 6, but its allegations are rife with holes and contradictions that defeat this conclusory assertion. For starters, DPPs' allegation that the agreements only contained "price guidelines" undermines their suggestion that any minimum price was actually enforced. CAC ¶ 82. And a manufacturer's nonmandatory, or nonenforced, pricing provisions are not an agreement to fix prices: even if a distributor unilaterally decided to adopt the price guidelines, this would at most amount to "parallel conduct" consistent with "rational and competitive business strategy." *Twombly*, 550 U.S. at 554; *see, e.g.*, *Kendall*, 518 F.3d at 1048 (dismissing Section 1 claim based on unsubstantiated allegation that banks agreed to charge the same fixed minimum fees).

Further undermining any inference of a conspiracy, the CAC suggests that not all the Distributors subscribed to the same purported price-fixing agreement. To the contrary, the CAC alleges only that unspecified later-added Distributors were required by "existing parties" to enter distribution agreements that contained an unspecified "wholesale price floor," *see* CAC ¶ 80, only "some of" the agreements had pricing or security deposit provisions, and only "some of" the distribution agreements required the sharing of information, *id.* ¶¶ 80–83; 93. This is far from a concerted anticompetitive conspiracy between all Defendants. At most, DPPs describe a hodgepodge of distribution contracts that may or may not have contained unspecified pricing provisions and may or may not have applied to certain Defendants at various points in time. *See, e.g.*, *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) (dismissing Section 1 claim where complaint did not raise facts about the "content and circumstances of any actual agreement" and in fact alleged that "the defendants' fee levels have all followed different pricing paths at different times, not even roughly in parallel").

Even assuming that the alleged price floors were mandatory (which is not clear from the CAC), that

SMOORE'S MOTION TO DISMISS DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

only "some of" the agreements contained these price floors belies DPPs' theory that the agreements operate to increase prices to supracompetitive levels. Even taking the CAC's conclusory allegations as true, a Distributor not subject to a price provision could undercut the alleged price-fixing agreement and undermine the entire scheme. "Contradictory allegations such as these are inherently implausible[.]" *Hernandez v. Select Portfolio, Inc.*, 2015 WL 3914741, at \*10 (C.D. Cal. June 25, 2015).

***Market Allocation Allegations.*** DPPs' allegations about Defendants' "market allocation" agreements are even more nebulous. The CAC does not allege that this agreement was ever written down and provides no details about when it was allegedly entered, by whom, or what its terms were. *See* CAC 80. The CAC is thus devoid of details sufficient to plead a "conscious commitment to a common scheme designed to achieve an unlawful objective." *California Crane Sch., Inc*., 722 F. Supp. 3d at 1038.

The CAC cites photos of an in-person meeting between representatives of Smoore and certain Distributors, which the CAC boldly asserts is proof of this alleged conspiracy. CAC ¶¶ 87–91. But these photos have all been publicly disclosed on social media posts for years, and they self-evidently just show routine marketing meetings, not unlawful conduct. This "is inadequate to allege a conspiracy," as it is implausible that Defendants would broadcast a conspiracy online for all to see, or that branding signs that say things like "friendship" actually mean "price fixing." *California Crane Sch., Inc.*, 722 F. Supp. 3d at 1039 ("photographs of Google CEO Pichai and Apple CEO Cook having dinner together" were insufficient where the photos "could just as easily suggest rational, legal business behavior by the defendants"). That leaves the CAC with the mere allegation that Defendants held meetings, which is not probative of a conspiracy given that Smoore would have perfectly lawful reasons for communicating with its distributors. *See, e.g.*, *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("communications between competitors do not permit an inference of an agreement to fix prices unless those communications rise to the level of an agreement, tacit or otherwise") (cleaned up).

That Defendants allegedly shared information about customer lists is likewise consistent with lawful vertical distribution agreements, since a manufacturer like Smoore has lawful reasons for gathering information about who buys its products. These include, for example, establishing the safety of its supply chain and research and product development efforts. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably

have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."). The same is true of Defendants' alleged "training" sessions—training employees about distribution arrangements and marketing efforts is fully consistent with procompetitive rationales such as ensuring efficient distribution.

***Security Deposits***. Lastly, the CAC claims Smoore enforced the alleged anticompetitive provisions by "threat of deducing money" from Distributors' security deposits, but admits that only "some" of the agreements contained security deposit provisions. CAC ¶¶ 92; 95. DPPs do not allege that Smoore actually makes any deductions, or that all Distributors were bound by the provision (DPPs do not specify which ones were). Moreover, without detailing the amounts of the deposits relative to the amounts Distributors stand to gain from breach of those provisions, the CAC fails to explain how this provision even operates to support the alleged anticompetitive scheme. This allegation thus cannot salvage the CAC's deficiencies.

### 3. DPPs Fail to Plead Harm to Competition

DPPs' antitrust claims also fail because they have not sufficiently alleged that the purported conspiracy caused harm to competition. *See Brantley*, 675 F.3d at 1204. That is particularly important in the context of vertical agreements which, absent a showing of "actual anticompetitive effect," are upheld as procompetitive. *Id.* at 1202; *see also Krehl*, 664 F.2d at 1354–57 (upholding Baskin-Robbins' "practice of licensing exclusive territories to other area franchisors while retaining certain areas for itself").

The CAC offers only bare conclusions that Defendants' alleged agreements harmed competition: that "members of the putative Class paid higher prices" and that Defendants "adversely impacted interbrand competition." CAC ¶¶ 9; 182–83. But those buzzwords mean nothing without factual allegations that describe ***how*** Defendants' agreements supposedly did this, and there, the CAC falls short. *See Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) (dismissing Section 1 claim where plaintiff failed to show how the higher prices the defendant distributor charged "dampen[ed] competition among these interchangeable brands"); *Intel Corp. v. Fortress Inv. Grp. LLC*, 511 F. Supp. 3d 1006, 1027–29 (N.D. Cal. 2021) (dismissing antitrust claim based on conclusory allegation of "supracompetitive prices"); *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021) (similar, where complaint lacked "substantive allegations regarding the alleged 'supracompetitive' price").

Critically, the CAC does not allege any harm to ***interbrand*** competition between different

manufacturers, which is the focus of the antitrust laws. *Leegin*, 551 U.S. at 895; *see also, e.g.*, *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461 (E.D. Pa. 2009) (approving resale price maintenance agreement that restricted only intrabrand competition). The CAC does not offer any plausible allegation about how Defendants' alleged agreements stopped *other* manufacturers from making vapes, or other distributors from selling them at lower prices—an omission that undermines DPPs' conclusory assertions about harm to competition. *See Brantley*, 675 F.3d at 1203–04 (complaint failed to allege harm to competition where it did not allege that defendant's conduct had "any effect on other programmers' efforts to produce competitive programming channels or on Distributors' competition as to cost and quality of service").

Instead, the CAC's allegations describe, at most, vertical resale price maintenance agreements, which, as the Supreme Court held in *Leegin*, are often procompetitive. *See* 551 U.S. at 889. The benefits of such vertical agreements include stimulating *interbrand* competition between manufacturers, reducing wasteful *intrabrand* competition between retailers selling the same brand, encouraging retailers to invest in promotional efforts to distinguish themselves from other retailers, and providing specific cost options for consumers. *Id.* at 889–92, 903–04. Those justifications apply forcefully here, where, by DPPs' own admission, the alleged market for cannabis vapes is a new one that did not exist ten years ago but has rapidly expanded to "tens of millions" of purchases due to advances in technology made possible by Smoore. CAC ¶¶ 52; 62. By the same token, the CAC provides a completely innocuous reason for alleged price increases—surging demand for a high-quality product. *See* CAC ¶¶ 42–43; 45–46; 62. In light of all this, the CAC's bare "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition." *Brantley*, 675 F.3d at 1202.

**Patent Lawsuit Allegations:** The CAC also devotes ten paragraphs to unrelated patent litigation involving Smoore, CAC ¶¶ 101–10, but those allegations are irrelevant. DPPs do not even reference them in their claims for relief, and patent litigation involving Smoore, but not any of the Distributor Defendants, plainly does not show that Smoore and the Distributor Defendants engaged in a conspiracy.

DPPs seem to suggest it was exclusionary for Smoore to engage in patent litigation against some of its "would-be competitors," *id.*, but there is nothing wrong with a patentholder enforcing its intellectual property. *Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004) ("behavior conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the

SMOORE'S MOTION TO DISMISS DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

antitrust laws"), *rev'd in part on other grounds*, 546 U.S. 394 (2006). And DPPs never allege that Smoore's litigation was brought against *all* "would-be-competitors," that all "would-be-competitors" were prevented from entering the market, or that any of the "would-be-competitors" would have competed in the alleged relevant market. Nor do DPPs allege that these patent actions caused *them* injury. *Cal. Computer Prods., Inc. v. Int'l Bus. Machines Corp.*, 613 F.2d 727, 732 (9th Cir. 1979) (plaintiff lacked standing where it did not demonstrate that defendants' conduct caused it injury). That renders the patent allegations irrelevant to the actual claim DPPs plead—that Smoore and Distributors conspired to raise prices DPPs paid.

Even if Smoore's patent lawsuits were relevant—they are not—they are protected by the First Amendment under the *Noerr-Pennington* doctrine, and DPPs have not met the high standard required to pierce that immunity. *See Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1063 (9th Cir. 1998) ("[W]hen a plaintiff seeks damages for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required.") (cleaned up). DPPs fail to raise exceptions to *Noerr-Pennington* or "specific allegations" that Smoore's petitions are "objectively baseless" such that they are "sham litigations." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). DPPs only allege that Smoore did not ultimately prevail in its ITC suit. CAC ¶¶ 104–06. But "the fact that a litigant loses his case does not show that his lawsuit was objectively baseless for purposes of *Noerr-Pennington* immunity." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000); *see also, e.g.*, *UCP Int'l Co. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 982 (N.D. Cal. 2019) (a finding of non-infringement does not mean patent litigation was "objectively baseless"). The inquiry ends there. *See Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.,* 863 F.3d 1178, 1187 (9th Cir. 2017) (courts analyze the second prong only after finding objective baselessness).

### C.    SUMMIT DOES NOT PLAUSIBLY ALLEGE A CARTWRIGHT ACT CLAIM

The CAC raises a Cartwright Act claim under Plaintiff Summit only, a corporation with a suspended business license that therefore lacks standing. *See infra*, Section V.D.2. Summit's Cartwright Act Claim should be dismissed for this reason alone. And, in any event, the claim is facially deficient.

Federal law, rather than state law, governs the sufficiency of this pleading, even as to state claims. *See E & E Co. v. Kam Hing Enters., Inc.*, 2008 WL 3916256, at *1 (N.D. Cal. Aug. 25, 2008) (collecting

-11-

cases). Federal courts "demand a high degree of particularity in the pleading of Cartwright Act violations" and dismiss such claims "where the complaint makes conclusory allegations of a combination and does not allege with factual particularity that separate entities . . . combined for the purpose to restrain trade." *Greencycle Paint, Inc. v. Paintcare, Inc.*, 2016 WL 1402845, at *4 (N.D. Cal. Apr. 8, 2016) (quotation marks omitted). Summit's *per se* claim under the Cartwright Act is based on the same meager facts as DPPs' Sherman Act claim and suffers from the same fatal defects. Because the "analysis under California's antitrust law mirrors the analysis under federal law," Summit's Cartwright Act claim should be dismissed along with its federal counterpart. *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d at 965 (affirming dismissal of Cartwright Act claim along with Sherman Act Section 1 claim) (citations omitted).

As discussed above, *supra*, Section V.B.2, DPPs fail to muster sufficient facts raising a plausible inference of an agreement to fix prices or otherwise restrain trade. *See* Cal. Bus. & Prof. Code § 16720(c); (e)(2). DPPs thus fail to "provide sufficient facts to plausibly establish the terms and conditions of the purported conspiratorial agreement." *Alan Darush MD APC v. Revision LP*, 2013 WL 1749539, at *5 (C.D. Cal. Apr. 10, 2013) (dismissing Cartwright Act claim).

Further, the CAC's vague allegations about unenforced "price guidelines" fail to state the kind of "coercive" combination needed to plead a *per se* claim under the Cartwright Act. Mere unilateral action by a manufacturer, such as suggesting price guidelines, combined with voluntary compliance by distributors will not suffice. *Beverage v. Apple, Inc.*, 101 Cal. App. 5th 736, 749–50 (Cal. App. 2024); *see, e.g.*, *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 372 (Cal. App. 2001) (manufacturer's "announcement of a resale price policy and refusal to deal with dealers who do not comply" was insufficient to establish a coercive agreement under the Cartwright Act); *Alan Darush*, 2013 WL 1749539, at *5 (similar). That is all the CAC musters here. The CAC alleges that "some of" the Distributors accepted agreements with "price guidelines" as a condition of becoming authorized dealers for Smoore, and fails to allege that Smoore ever enforced these price guidelines. This at most points to unilateral conduct by Smoore combined with some Distributors' voluntary compliance, which is insufficient to establish an actionable violation of the Cartwright Act. CAC ¶¶ 80–82; *see Beverage*, 101 Cal. App. 5th at 749–50.

The Court need not assess whether Summit states a violation of the Cartwright Act under the rule of reason, because the CAC does not even plead such a claim. As such, if the Court finds that Summit fails

to state a *per se* claim, Summit will "be without recourse to the rule of reason" and its Cartwright Act claim should be dismissed. *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038 (N.D. Cal. 2013) (warning that, where plaintiff omitted rule-of-reason claims, the court would decline to review the claim under the rule of reason if it found no *per se* violation); *see, e.g.*, *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n.2 (2006) (declining to review alternative argument where respondents had "not put forth a rule of reason claim").

### D.   DPPS LACK STANDING TO BRING THEIR ANTITRUST CLAIMS

#### 1.   DPPs Lack Standing Because Cannabis Trade Is Illegal Under Federal Law

DPPs cannot, as a matter of law, establish standing for their Sherman Act claims, because they admittedly engage in an illegal market by trafficking cannabis products, which precludes them from recovering under the antitrust laws. Cannabis is a Schedule I substance, making its manufacture, distribution, and possession federal crimes. 21 U.S.C. §§ 812(c), 841(a)(1), 844(a); *Gonzales v. Raich*, 545 U.S. 1 (2005). DPPs cannot plead a cognizable antitrust injury incurred through the conduct of unlawful business. *See Modesto Irrigation Dist. v. PG&E*, 309 F. Supp. 2d 1156, 1169–70 (N.D. Cal. 2004), *aff'd*, 158 F. App'x 807 (9th Cir. 2005). This makes sense: the federal antitrust laws cannot protect conduct and prevent injury in a market that itself violates federal law. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (antitrust injury is "injury of the type the antitrust laws were intended to prevent").

Indeed, courts consistently bar antitrust suits grounded in dealings in illegitimate markets. *See Modesto*, 309 F. Supp. 2d at 1170 (claims grounded in "unlawful" business "untenable at their core"); *Alaska Airlines Inc. v. Carey*, 395 F. App'x 476, 478–79 (9th Cir. 2010) (similar) ("'black market' of frequent flyer miles"); *Microsoft Corp. v. Computer Support Servs. of Carolina*, 123 F. Supp. 2d 945, 952 (W.D.N.C. 2000) (similar) (market for pirated software copies). And state legalization does not change the analysis—cannabis trade remains a "federally illegal market," something state law cannot change. *See Ctrl Alt Destroy v. Elliott*, 2025 WL 790963, at *8 (S.D. Cal. Mar. 12, 2025) (remedy disallowed for cannabis trade); *Brinkmeyer v. Washington State Liquor and Cannabis Bd.*, 2023 WL 1798173, at *13 (W.D. Wash. Feb. 7, 2023) ("Congress has clearly stated its intent for no interstate cannabis market to exist").

#### 2.   Summit Lacks Standing Because It Lacks a Valid Business License

Independently, Summit lacks standing because it is an inactive California corporation, suspended

as of January 3, 2022 by the California Franchise Tax Board.[2] *See Christian & Porter Aluminum Co.*, 584 F.2d 326, 331 (9th Cir. 1978) ("a corporation which has been suspended for failure to pay franchise taxes is prohibited from suing"). This dooms the state law claims, which are brought by Summit only.

### E.    SUMMIT'S UCL CLAIM FAILS

DPPs also plead an "unfair"-prong claim under the UCL. CAC ¶¶ 202-13. However, courts find that alleged conduct is "not 'unfair'" if it "is deemed reasonable and condoned under the antitrust laws." *Chavez*, 93 Cal. App. 4th at 375. This means that a claim under the UCL is "barred so long as [Defendants'] activities are lawful under the antitrust laws." *City of San Jose v. Off. of the Comm'r of Baseball*, 776 F.3d 686, 692 (9th Cir. 2015). Thus, because the UCL claim is derivative of DPPs' antitrust claims, it falls with those claims. *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1111 (N.D. Cal. 2022).

### F.    DPPS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

DPPs propose a sweeping class period from December 1, 2016 to the present. CAC ¶ 31. Their "Sherman Act, Cartwright Act, and UCL claims" are time-barred because DPPs failed to initiate this action within the "four-year statute of limitations." *Ryan v. Microsoft Corp.*, 2015 WL 1738352, at *10 (N.D. Cal. Apr. 10, 2015). The clock starts when the injury occurs, "regardless of whether or not DPPs knew of their injury at the time it occurred," *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1210 (N.D. Cal. 2015). DPPs presume an injury occurring as early as December 1, 2016, when Defendants allegedly entered into the anticompetitive agreement, CAC ¶¶ 5; 31. This is "necessarily more than four years" before DPPs sued. *Crowder v. LinkedIn Corp.*, 2023 WL 2405335, at *2 (N.D. Cal. Mar. 8, 2023). DPPs' claims are thus untimely. *See, e.g.*, *In re Animation Workers*, 87 F. Supp. 3d at 1211 (antitrust claims time-barred).

DPPs' tolling arguments are unavailing. DPPs' "bald assertion" that they purchased vapes at unspecified points "during the Class Period" are insufficient to invoke the "continuing violation" doctrine. CAC ¶¶ 19–21; 145. *In re Animation Workers*, 87 F. Supp. 3d at 1212–13 (plaintiffs' "bald assertion" that their interests were "repeatedly invaded" during the class period, without details of "specific conduct" and "specific dates," held insufficient to allege continuing violation). Even if it applied, the doctrine would

---

[2] Summit Industrial Solutions, LLC, *Bizprofile* (last accessed June 27, 2025), https://www.bizprofile.net/ca/santa-ana/summit-industrial-solutions-llc. This Court may take judicial notice of Summit's suspended status. *See, e.g.*, *Weiss v. Rocket Mortg., LLC*, 2025 WL 1674371, at *2 (C.D. Cal. May 28, 2025) (taking judicial notice of the fact that corporation was suspended at the time of service).

SMOORE'S MOTION TO DISMISS DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

merely limit DPPs' recovery to claims incurred in the four years preceding this action. *See id.* at 1211.

Nor have DPPs plausibly alleged fraudulent concealment. DPPs' assertion that the conduct was "self-concealing," CAC ¶ 138, does not suffice. *See In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d at 1216 ("[T]he mere fact of a secret conspiracy [is not] sufficient to toll the statute of limitations under the fraudulent concealment doctrine."). DPPs must allege (1) that "[D]efendant[s] took ***affirmative acts***" to mislead DPPs; (2) DPPs' lack of "actual or constructive knowledge" as a result of Defendants' affirmative acts; and (3) "diligen[ce]" on DPPs' part. *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1073 (N.D. Cal. 2016) (emphasis added). The allegations must meet Rule 9(b)'s heightened pleading standard, identifying the "time, place, and specific content" of any misleading statements. *Id.* at 1075. The CAC fails to do so.

DPPs rely on a representation in a Global Offering memorandum issued by "Smoore's parent" (a non-party) to prospective investors in Hong Kong, CAC ¶ 141,[3] but this does not pass muster under Rule 9(b). DPPs must allege that a "***Defendant*** made such representations ***to them***," and that "they deferred filing suit as a result of the representation." *Glob. Servs. v. Ikon Off. Sols.*, 2011 WL 6182425, at *3 (N.D. Cal. Dec. 13, 2011) (plaintiffs failed to plead fraudulent concealment). Nor do DPPs sufficiently allege that the alleged memorandum was fraudulent—the memorandum's representation that Smoore only provided "guidance regarding price range" that its distributors could choose to follow or not, CAC ¶ 141, is consistent with the CAC's acknowledgement that the agreements at issue only contained nonmandatory "price guidelines," *id.* ¶ 82. DPPs' references to alleged representations by Defendants that CCELL vapes are expensive because they are of "highest standard and quality in the industry," *id.* ¶ 143, fare no better. These generic statements about product quality are non-actionable puffery insufficient to toll the statute of limitations. *See, e.g.*, *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 554–56 (N.D. Cal. 2019) ("Apple's alleged statements that its computer screens were of the 'highest quality'" were "non-actionable puffery").

## VI.    CONCLUSION

For the foregoing reasons, DPPs' CAC should be dismissed with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

[3]    The Court may take judicial notice of "documents referenced in the Complaint." *Garrison*, 159 F. Supp. 3d at 1060. The cited Global Offering explicitly states that it was directed only to prospective investors in Hong Kong. *See* Smoore Int'l Holdings Ltd., *Global Offering*, HKE News (June 29, 2020), https://www1.hkexnews.hk/listedco/listconews/sehk/2020/0629/2020062900021.pdf ("This prospectus is issued by us solely in connection with the Hong Kong Public Offering … [and] may not be used for the purpose of making, and does not constitute, an offer or invitation in any other jurisdiction[.]").

DATED:  June 27, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Kevin Teruya*

Kevin Teruya
William Sears
*Attorneys for Shenzhen Smoore Technology Company, Limited*

**CERTIFICATE OF SERVICE**

On Friday, June 27, 2025, I caused a true and correct copy of the foregoing **SMOORE'S MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)** to be electronically served on all parties to this lawsuit, using the Court's e-service system.

By */s/ Kevin Teruya*
Kevin Teruya
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
*Attorney for Shenzhen Smoore Technology Company, Limited*

SMOORE'S MOTION TO DISMISS DIRECT PURCHASER
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT